Upon those questions the Court had the benefit of a full argument at the last term. The impressions received were then so decided, as to have warranted the delivering of our judgment immediately, if it had been necessary; but as the pi'osecution of the work conducted by this company could not be impeded by the delay, and some of the points made are novel and of much magnitude, in reference to a class of subjects on which there has been recently and probably will be copious legislation, it seemed discreet, before announcing a decision, to give to the argument, and to the whole subject, the deliberation for which the vacation offered the opportunity.
 

 The right of the public to private property, to the extent that the use of it .is needful and advantageous to the
 
 *456
 
 public, must, we think, be universally acknowledged. Writers upon the laws of nature and nations treat it as a right inherent in society. There may, indeed, be abuses of the power, either in taking property without a just equivalent, or in taking it for a purpose really not needful or beneficial to the community; but when the use is in truth a public one, when it is of a nature calculated to promote the general welfare, or is necessary to the common convenience, and the public is, in fact, to have the enjoyment of the property or of an easement in it, it cannot be denied, that the power to have things before appropriated to individuals again dedicated to the service of the state, is a power useful and necessary to every body politic. Theoretical writers have derived it from the original and full property, in^ts highest sense, existing in the community or sovereignty of the state before any division among individuals, and they deem the right of resumption for common use to be tacitly reserved by implied agreement. Thus derived, the power has the sanction of compact, which probably furnishes the motive for tracing it to this source as constituting a sanction founded in morals and nature. But, practically, it is immaterial whether the right be supposed to have been impliedly reserved because it ought not to be granted, or because it is a portion of the national sovereignty which is inalienable by the government, or whether the right is created by the public necessity, which at the time calls for its exercise, — its existence in every state is indispensable and incontestible.
 

 A familiar instance of the exercise of the power is the levying of revenue, by taking from the citizen, from time to time, such portions of his property as may be requisite to conduct the government, instituted by the nation. Another instance essentially of the same character, is that of devoting private property to public use as a highway. A nation could not exist without these powers, and they involve also the welfare of each citizen individually. An associated people cannot be conceived, without avenues of intercommunication, and therefore the public must have the right to make them without, or against, the consent of individuals.
 

 
 *457
 
 This, too, is not only the right of the nation, constituted by the aggregate body of the people, but it is a right and power of government. It was said at the bar, that it was a sovereign right, and therefore remains with the people of this state, since it is not granted in the Constitution. The position, if true, would destroy the value of the power here and dissolve the government. But it seems to the Court, wholly untenable. It is true the
 
 eminent domain
 
 is a political and sovereign power; so is every other power vested in, or exercised by any government. Before a people institute a government, they are themselves necessarily the possessors of all political power which men, by the natural and divine law, can rightfully exercise over each other. But by the constitution of government, the political powers requisite to the existence of government and to the discharge of those functions for which the community created it, are transferred by the people to the government. From the people, the government derives the power to act on and control the people themselves, unless in those points, in which the government is restricted by limitations of power. With that exception, the powers of the nation become those of the government, save only, that over the constitution of government itself, to abolish or alter it. The government of the United States is an exception to the general principle, from its peculiar construction. To its formation the people of the several states were parties, and they, as the people of several states, have specially delegated to it particular powers for the purpose of making themselves one people, under one government, for particular purposes only. But these incidental powers, derived by a fair, proximate, and natural implication from those enumerated, or from the purposes of forming the constitution, as declared on its face, have been exercised, and must be yielded. The government of North Carolina, however, is not one of specially delegated powers; it is only one of limited and restricted power.
 

 The Constitution begins by simply “establishing a
 
 government
 
 for this state,” and vests “ the legislative power in a Senate and House of Commons.” There are no
 
 *458
 
 grants of power to the legislature except in a few instances,. where the power would not seem naturally to arrange itself unc[er t[ie general class of legislative powers, according to precedent usage, as the election of the governor and other high officers. It does not even eonfer the revenue power, nor that of granting the vacant lands; yet the legislature has always exercised both powers, by levying taxes, and by authorising dispositions of the public domain, although “ the right to the unappropriated soil is declared to be, in a free government, one of the essential rights of the collective body of the people,” which means nothing more than that it shall not be seized on by any individual or particular class, but shall be kept or disposed of, for the common benefit of the whole people. This power, or right of
 
 eminent domain,
 
 is likewise possessed by the government, and may be exercised by the legislature or under its authority. Unless vested there, it cannot be called into action, and without it neither the government nor the state could hold together. It is peculiarly fit to be wielded by the legislature — it is a power founded on necessity. But it is a necessity that varies in urgency with a population and production increasing or diminishing, and demanding channels of communication, more or less numerous and improved, and therefore to be exercised according to circumstances, from time to time. The legislature of North Carolina, when it was a province, and since it became a state, have always exercised it, either directly or through the intervention of the Courts that administer the domestic police of the several counties. It is a power which the government is bound to the people to exercise, limited only by a sound discretion as to the number and nature of the^roads, and restricted as to the mode of exercising it by the provisions in the Constitution, if any such there be. It is contended that there are such provisions, and that the act before us is in violation of them in several respects.
 

 It is said — first, that the right of property involves the right to precedent compensation for it, when taken for public use. It is thence deduced as a corrollary, that
 
 *459
 
 the questions whether the property shall be taken, and what compensation shall be paid for it, do constitute a question at law respecting property, and must be tried by a jury, according to the 14th section of the Bill of Rights.
 

 If the government can lawfully take private property for public use, without compensation, then, confessedly, there is no controversy to be tried by a jury. But the government may prescribe such terms as may be deemed befitting its own character and the justice of the state. So, though there be a constitutional obligation on the government to make compensation, yet if the compensation need not precede the taking of the property, the condemnation of the defendant’s land is not illegal, because he may refer to the constitutional mode of ascertaining and enforcing payment of its value and other damages. It behooves the counsel for the defendants therefore to establish both parts of the proposition.
 

 The right to compensation, as an absolute and legal right, was contested by the counsel for the plaintiffs, and strenuously asserted on the other side. The Court do not decide it, but in this case will assume it to exist as contended on the part of the defendant, though not on all the grounds on which -his counsel placed it. The Court cannot adopt some of the several distinct sources from which it was derived.
 

 One of them was the fifth amendment of the Constitution of the United States, providing that “ no person shall be deprived of his life, liberty, or property, without due process of law ; nor shall private property be taken for public use without just compensation.” That has always been understood to be a limitation of the power of the Federal government, and not of that of thé states. It was authoritatively so held by the Supreme Court of the United States, in
 
 Barrow
 
 v.
 
 The Mayor of Baltimore,
 
 7 Peters’s Rep. 243; which dispenses with further observations from this Court.
 

 The natural right and justice of compensation, and the nature of our free institutions, were also relied on as sufficient in themselves to create the supposed restriction on ■this power. But the sense of right and wrong varies so
 
 *460
 
 much in different individuals, and the principles of what ¡s called natural justice are so uncertain, that they cannot be referred to as a sure standard of constitutional power. ft is to the Constitution itself we must look, then, and not merely to its supposed general complexion. There must be words in it, which, upon a fair interpretation, and in reference to the subject-matter, and to direct consequences, are incompatible with the enactments of .the legislature, before a Court can pronounce such enactments null. The principle is, however, so salutary to the citizen, and concerns so nearly the character of the state, that it may well be urged that it must be consecrated by its adoption in some part of the free Constitution of this state. We should be reluctant to pronounce judicially, our inability to find it in that instrument. If it be not incorporated therein, the omission must be attributed to the belief of the founders of the government, that the legislature would never perpetrate so flagrant an act of gross oppression, or that it would not be tolerated by the people, but be redressed by the next representatives chosen. There is no doubt, that, while the legislature and people of this state expressly restrict the action of the general government on this subject, it must have been supposed by the people that their own local government was in like manner restrained, or would never act in a manner to make such a restraint necessary. There is, however, no clause in that instrument which seems to bear on the point, unless it be that which is relied on in the argument for the defendant. It is the 12th section of the Bill of Rights, which declares, “that no freeman shall be disseised of his freehold, or deprived of his life, liberty or property, but by the law of the land.” Under the guaranty of this article, it has been held, and in our opinion properly held, that private property is protected from the arbitrary power of transferring it from one person to another. We doubt not that it is also protected from the power of despotic resumption, upon a legislative declaration of forfeiture, or merely to deprive the owner of it, or to enrich the treasury, unless as a pecuniary contribution by way of tax. Such acts have no foundation in any of the reasons on which depends the
 
 *461
 
 power, in virtue of the right of eminent domain, to take .private property for the public use, and they could not be sustained by the offer of the fullest compensation. Though not so obvious, it may also be true that the clause under consideration is restrictive of the right of the public to the use of private property, and impliedly forbids it, without compensation. But it is a point on which the Court is not disposed, nor at liberty, to give a positive opinion on this occasion. It is not required as a preventive warning against unjust legislation. For it is more inadmissible to suppose that the legislative acts will be designed to work •oppression and wrong, than to violate the Constitution directly. It is not deemed probable, and with difficulty conceived to be possible, that the legislature will at any time talfe the property of the citizen for public use, without at the same time providing some reasonable method of ascertaining a just compensation, and some certain means of paying it. Moreover, it is not open to the Court to give the definitive opinion demanded, because it does not in our judgment necessarily arise here, and it is indecent to decide so grave a question extra-judicially. Here the statute does give compensation fair and liberal, embracing not only the direct, but all incidental and consequential damages. For the purpose of this cause, therefore, it may be taken for granted, that compensation is in all cases requisite, as no doubt it will in all cases be made. But with this admission, the Court is of opinion that the proposition of the defendant’s counsel, as to the mode of ascertaining it,'and the period of payment, is not sound.
 

 Unless the compensation must precede the seizure of the property, it is true that in many cases, one of the principal securities for it is impaired, and by possibility may be lost; that of the judicial enforcement of the right. When the property is taken for the public directly, and the payment is to be made out of the treasury, the compensation cannot be made the subject of litigation against the state, but the party must rely on the integrity of the legislature and the general will, to have equal right done to all. Yet ■it seems impossible to lay it down as a principle, that •compensation is indispensably a condition precedent; and
 
 *462
 
 this must be added to the examples already known, in which an injunction of the Constitution cannot be made the subject of judicial cognizance, but finds its only sanction in the understanding and conscience of the legislator. The exigencies of the public may be too urgent to admit of the delay requisite to the simplest mode of previous investigation. In time of war, for example, an army must have food, or ammunition, or quarters, a field for encampment, or an entrenchment for defence, and the necessity is pressing and immediate. Other instances suggest themselves, in which a previous assessment cannot be had with any reasonable hope of doing justice. The act before us supplies one such in the
 
 21st
 
 section. It authorises an entry into lands adjacent to the £oad, to cut, quarry, dig, and carry away wood, stone, gavel, or earth for the construction or repair of the road, 'And for those materials, and for all incidental damages done in taking or carrying them away, reasonable compensation is to be assessed by three freeholders, upon view and on oath. In the like manner, our public road law directs the overseer to cut timber and dig earth for bridges and causeways, and gives the owner a petition to the County Court for adequate compensation, to'be fixed by the justices, out of the county funds.. Antecedent assessments, in such cases, must be made entirely at a venture, for it is uncertain what quantity of materials will be requisite or can be procured at a particular place, or how many tracks may be broken on the owner’s land, and even the weather and season of the year may materially vary the damage. Therefore, the acts must almost necessarily, provide for payment for injuries done, which can be seen, known, and truly estimated. /The compensation to be adequate, must be subsequent. .
 

 It may be observed that in this, we only adopt the established course of legislation and adjudication in that country from which we derive Magna Charta and most of the other free principles declared in our Bill of Rights. The case of
 
 Boyfield
 
 v.
 
 Porter,
 
 13 East, 200, is a decision upon a similar act of parliament which confines the owner of the land to the remedy given by the act. The
 
 *463
 
 case is cited with an acknowledgment, that it is not an authority upon the question of legislative power in America; for that in England is unquestionably transcen-dant, and ours is as certainly limited. But when it is recol-rected, with what reverence the great charter has ever been held by both branches of that legislature, and especially by that which is popular; and when, moreover, it is called to mind, that the rights of private property have never been more respected, than in that country, where it is carried to the extent, perhaps injurious, of successfully opposing great political reforms, and generally prevents the abolition of even a public office without compensation to the incumbent, it may reasonably be inferred, that neither the parliament, nor the courts, nor the people of that country, perceived an infraction of the Magna Charta in those statutes. As practical evidence of the true sense of that clause of it, which has been transferred into our Bill of Rights, those legislative and judicial proceedings, though not authority, are entitled to much respect. In a still greater degree, does the legislation of our own country, commencing at an early period of our provincial state, and continued up to the present time, upon the subject of laying out roads and making compensation, claim our attention asan authoritative exposition of the general sense through a long course of time, of the relative rights of the public and of individuals. It establishes or recognises, on the one hand, the obligations of the public to pay a fair remuneration for injuries to individuals for the public service; but, on the other, it evinces the settled usage, and thence the legality of providing that the compensation may be antecedent, or subsequent to the injury, as the necessities of the public for the property may be immediate or otherwise, and according to the convenience of both parties for truly estimating the amount. In the Constitution of New York, is contained an express clause for compensation for private property taken for public use; and it is there settled also, that'neither the payment nor the assessment need precede the opening of a road over the land of an individual.
 
 Core
 
 v.
 
 Thompson,
 
 
 *464
 
 6 Wendell, 634. Indeed the principle applies alike to every entry on the land, and would exclude one even for
 
 . . .
 
 ~ , , examination and survey, it correct. 1 he Court concludes therefore, that it is competent to the legislature to take private property, for the public use, without a previous or cotemporaneous payment of its value.
 

 If the foregoing reasoning be just to establish the result declared, it seems to go far also to show, that it is in the discretion of the legislature to appoint the tribunal by which the compensation shall be assessed. If the obligation on the legislature to make compensation, be perfect and constitutional, it may be competent to the judiciary to declare that the title of the individual was never divested, if the legislature were to refuse, or for a long time delay, to make any compensation. Yet, if that which appears to be just, or does not appear to be insufficient, be provided and offered by the legislature, however it may have been fixed on, there is no ground for the interposition of the Courts. It is said, if this be true, the party to the controversy nominates the judges to decide, and might, indeed, make the decision directly without a reference to any other person. Perhaps the act might be found so nearly allied to the judicial functions as to be forbidden to the legislature. If it be not, the Court is not aware of any thing to prevent a legislative assessment, except propriety, and the unfitness of large bodies for the impartial and minute investigations necessary to the justice of such cases. It is not likely that the attempt will ever be made even in point of form, unless to carry into effect a previous agreement of parties. At all events, it was not done in this instance, but the decision was referred to persons judicially selected, impartial, and acting under oath, with opportunities for full information from evidence and from view. To such a tribunal no objection seems to be furnished by the principles-of justice, or by the provisions of the Constitution.
 

 It was, however, contended at the bar, that it is an evasion of the spirit, if not a violation of the express words of the fourteenth section of the Bill of Rights, by which, “in all controversies at law respecting property, the
 
 *465
 
 ancient mode of trial by jury is to remain sacred and inviolate.”
 

 This is a controversy
 
 at law.
 
 Is it also one
 
 respecting property ?
 
 In what sense is it so ? The necessity for the road between different points is a political question, and not a legal controversy; and it belongs to the legislature. So, also, does the particular line or route of the road, whether it shall or shall not be laid out so as to pass over the lands of particular persons; and that has also been decided by the legislature or referred to scientific engineers. The only subject for the consideration of the jury is, therefore, the quantum of compensation. Reduced to that point, the case of
 
 Smith
 
 v.
 
 Campbell,
 
 3 Hawks, 590, is a decision that it is not a controversy£ respecting property,’ within the sense of the Bill of Rights. But the remaining words of the clause yet more clearly exclude this case from its operation.
 
 “
 
 The ancient mode of trial by jury,” is the consecrated institution. This expression has a technical, peculiar, and well understood sense. It does not import that every legal controversy is to be submitted to and
 
 determined
 
 by a jury, but that
 
 the
 
 trial by jury shall remain as it anciently was. Causes mayyet be determinediondemurrrer, and that being an issue of law is determined by the Court. Final judgment may also be taken on default, when the whole demand in certainty is thereby admitted; as is provided for actions of debt by the act of 1777, which was passed by nearly the same persons who composed the Congress of 1776. Interest at a certain rate, fixed by law upon notes as well as bonds, and in actions of assumpsit, is computed by the clerk; and costs, in all cases, taxed by him. These are all controversies respecting property in the same sense with the present, but they are none of them trials oreases for trials by jury. There is no
 
 trial
 
 of a cause, standing on demurrer or default.
 
 Trial
 
 refers to a dispute and
 
 issue
 
 of fact, and not to an issue of law, or inquisition of damages. The terms of this section are with respect to the controversies mentioned in it, analogous to those in the ninth section with respect to criminal prosecutions. That provides that “ no freeman shall be convicted of any crime, but by the unanimous verdict of a
 
 *466
 
 jury.” Judgments may be undoubtedly given in indictments on demurrer, on the prisoner’s standing mute and refusjng t0 plead, upon submission and upon cognovit— when therefore a conviction by verdict is spoken of, it has in view only the case of a plea by the accused and issue on it. That raises a question which can be
 
 tried
 
 only by jury, and determined against the accused only by the unanimous consent of the jury. “ Trial by jury” in civil cases, is equivalent to “ conviction by verdict” in criminal proceedings. They do not include by force of those terms, any case in which there is not an issue of fact. It is the course, both in England and this country, to resort to this favourite Anglo-Saxon mode of determining all legal controversies, as well as trying issues, civil and criminal, where it can be used without great inconvenience. It might have been adopted in this instance, and probably would have been prescribed in the act, but for the delay, expense and difficulty of proceeding by writ of
 
 ad quod damnum
 
 on so long a road, passing over the lands of so many proprietors. But it is not indispensable in such a case, because it is not embraced in the words used in the Bill of Rights. Many of the state legislatures, to whose codes we have had access, have proceeded in a similar way; and it has received judicial approbation. In New York, it was held by Chancellor Walworth, in
 
 Beekman
 
 v.
 
 The Saratoga and Schenectady Rail Road,
 
 3 Paige’s Rep. 45, that the ascertaining the damages by commissioners, was not repugnant to that part of the Constitution of that state which preserves the trial by jury. In
 
 Livingston
 
 v.
 
 The Mayor of New York,
 
 8 Wendell, 85, the same point was ruled unanimously, both in the Supreme Court and in the Court of Errors. In
 
 Livingston
 
 v.
 
 Moore,
 
 7 Peters, 469, the distinction upon the words “ trial by jury” is explicitly expressed by the Supreme Court of the United States. It arose upon these words in the Constitution of Pennsylvania,
 
 “
 
 Trial by jury shall remain as heretofore.” The Court say, “the distinction between trial by jury, and inquest of office is so familiar to every mind, as to leave no sufficient ground for extending to the latter that inviolability, which could have been intended only for the former.” In
 
 *467
 
 the same light does the subject seem to have been viewed by our legislature in passing a variety of acts. Not to mention the numerous charters for r.oads and canals, with provisions similar to that now before us, the first mill act and those for partition and others, substitute commissioners for a jury to assess the value in the one case, and to make the division in the other, with power to charge one lot with money to be paid to the other.
 

 The opinion of the Court is, that it was competent to the legislature to adopt the mode it did, for the assessment of the damages to the defendant.
 

 It is further objected, that the charter takes more than the right of eminent domain authorizes. It is said, that the
 
 public
 
 is only entitled to the
 
 use
 
 of private property, leaving the property and right of soil in the proprietor; and that here the whole fee is taken and not for the public, but for the company, which is but a private corporation.
 

 The doctrine of the common law is, that the public has only an easement in the land over which a road passes, and that the right of soil is undisturbed thereby. The reason is, that ordinarily the interest of the public requires no more. Every beneficial use is included in the easement, in respect at least to such highways as existed at the time the principle was adopted, and to which it had reference. But if the use requisite to the public, be such an one as requires the whole thing, the same principle which gives to the public the right to any use, gives the right to the entire use, upon paying adequate compensation for the whole. It is for the legislature to judge, in cases in which it
 
 may
 
 be for the public interest to have the use of private property, whether in fact the public good requires the property, and to what extent. From the great cost of this road, from its nature and supposed utility, it seems to be contemplated to preserve it perpetually, or for a great and indefinite period. All persons are excluded from going on it, unless in the vehicles provided by the public or its agents; and to enforce that provision and adequately protect the erections from injuries, it may be requisite to divest the property out of individuals. But whatever may be the rights of the public in this respect,
 
 *468
 
 the question does not arise in the present stage of the the controversy. The charter seems to be ambiguously expressed upon this part of the subject. It bears the marks of having been drawn for a perpetual charter, and to have lost that character by the addition of the last section, without corresponding alterations in those preceding. We suppose it clear, however, that it was intended to divest the right of soil at all events for the corporate term as now fixed, or as it may be extended. It seems equally clear, notwithstanding the words of perpetuity in the 16th and 25th sections, that no more is divested out of the defendant, than, upon the whole act, is vested in the corporation, or may be vested in it by a future act. As this may in that way continue forever, the legislature properly required the whole property to be paid for. But the rights of the defendant are not therefore necessarily extinguished. There may be a reversion in him, that will come into possession at the forfeiture or expiration of the charter. If so, at the proper periods, and when the question shall be presented in the proper form, it will doubtless be decided. At present, the only question is, whether the land shall be condemned for the purpose of the road, and on what terms; and the right of soil is not, in our opinion, involved. To condemn it, there must be a report confirmed and recorded; but the effect of that proceeding on the right of property, can only be determined, when a suit is brought, founded on the right of property. It would be improper that the present judges should volunteer their private opinions on it.
 

 Upon the supposition that the legislature may take the property to the public use, it is next said, that this taking is not legitimate, because the property is bestowed on private persons. It is true that this is a private corporation; its outlays and emoluments being individual property ; but it is constituted to effect a public benefit, by means of a road, and that is
 
 publici juris.
 
 In earlier times, there seems to have been a necessity upon governments, or at least it was a settled policy with them, to effect every thing of this sort by the direct and sole agency of the government. The highways were made by the
 
 *469
 
 public, and the use was accordingly free to the public. The government assumed the exclusive direction as well as authority, as if they chose to be seen and felt in every thing, and would avoid even a remote connection between private interests and public institutions. An immense and beneficial revolution has been brought about in modern times, by engaging individual enterprise, industry, and economy, in the execution of public works of internal improvement. The general management has been left to individuals, whose private interests prompt them to conduct it beneficially to the public; but it is not entirely confided to them. From the nature of their undertaking and the character of the work, they are under sufficient * responsibilities to insure the construction and preservation of the work, which is the great object of the government. The public interest and control are neither destroyed nor suspended. The control continues as far as it is consistent with the interests granted, and in all cases as far as may be necessary to the public use. The j road is a highway, although the tolls may be private pro- ■ perty, by force of the grant of the franchise to collect them. It is a common nuisance to allow it to become. ruinous, or to obstruct it. The government may, upon sufficient cause, claim a forfeiture of the charter, or compel the execution and repairs of the road by those undertaking them, by any means applicable to other persons charged with the like duties in respect to other highways. The difference is, that the corporation, in lieu of the sovereign, has the custody and property of the road, and the collection of the tolls, in reimbursement of the cost of construction and remuneration for labour and risk of capital. As to the corporation, it is a franchise, like a ferry or any t other. As to the public, it is a highway, and in the strictest
 
 sense, publici juris.
 
 The land needed for its construction is taken by the public for the public use, and not merely for the private advantage of individuals. It is only vested in the company for the purposes of the act; that is, to make the road. This case is therefore essentially different from that of
 
 Hoke
 
 v.
 
 Henderson,
 
 4 Dev. Rep. 1, which was so much insisted on at the bar. There, the office, a
 
 *470
 
 subject of property to a certain extent, was taken from one and vested in another, exactly in the same state and to the same public purposes as it was held by the first. The public interest was in the service of the officer, being precisely the same, with either person for the incumbent. It was therefore taken solely for the benefit of the new appointee, which could not be supported. But in this case, the land is taken from the defendant for a public purpose, to which it had not been applied while in his hands. It is taken to be immediately and directly applied to an established public use, under the control and direction of the public authorities, with only such incidental private interests, as the legislature has thought proper to admit, as the means of effecting the work and insuring a long preservation of it for the public use.-
 

 It is the opinion of the Court, that no one of the objections is sufficient to arrest the proceeding for condemnation, and that the judgment of the Superior Court must be affirmed. This will be certified to that Court, that a writ of
 
 procedendo
 
 may issue thence to the County Court.
 

 Per Curiar. Judgment reversed.