COMMISSIONERS OF JOHNSTON COUNTY v. B. S. LACY,
STATE TREASURER.

(Filed 26 September, 1917.)

1. **Constitutional Law—Statutes—Roads and Highways—Bonds—Counties—Townships—State Aid.**

   Chapter 6, Laws of 1917, is designed to enable the State to lend its aid to road building and maintenance in counties, townships, and road districts, applying therefor in accordance with the terms of the act, the State to issue its 4 per cent bonds upon receiving a bond from the county at 5 per cent interest, intending to take care of the State's bond with interest in a designated period of years; and provides that the county bond may be put in suit to recover any deficiency, with penalty attached, section 19 establishing a limit on the amount the county may borrow; section 11 requiring the bond to obligate the county for its payment; section 20 extending its terms so as to include townships and road districts, requiring bond to be executed by the county commissioners, wherein the township and road district is situate, making it their duty to levy and the sheriff to collect the special tax: *Held,* the bond contemplated to be given to the State is that of the county and not that of the township or road district.

2. **Same—Taxation Without Benefit—Equal Protection—Faith and Credit.**

   Section 20 of chapter 6 of the Laws of 1917, extending the provisions of the act to townships and road districts, requiring that the bond of the county be given the State upon which the latter is to issue its forty-one year 4 per cent bonds and turn over the proceeds under the scheme set forth to the township, etc., to the establishment and maintenance of the

public roads of the particular township, etc., is one entirely within the township government as to the control and expenditure of the fund, without reference either to State or county benefit, and is unconstitutional as the taxing of other districts, etc., within the county, without their consent, for the exclusive benefit of one of them, and is in derogation of Article I, section 17, forbidding that any person be disseized of his freehold liberties and privileges, or in any manner deprived of his property, etc., "but by the law of the land," and of Article VII, section 7, prohibiting a municipality to contract a debt or pledge its credit, except for a necessary expense thereof unless with the approval of its qualified voters.

## 3. Same—"Necessaries"—Benefit.

While the building of public roads has been held a necessary expense within the meaning of Article VII, section 7 of our Constitution, the application of the principle may not be extended to instances where a statute requires the county to issue its bonds for road purposes to obtain aid for a township or local taxing district therein, upon the approval of the voters of the particular district alone, and without benefit to the others.

## 4. Roads and Highways—Statutes—Counties — Townships — Bonds — State Aid—Adequate Security.

Section 20, chapter 6, Laws of 1917, cannot be construed so as to require the county commissioners, as agents for the township, to give the township bond to the State upon which the latter shall issue its 4 per cent bond to aid the township in the construction, etc., of its public roads, for apart from the express language, the statute contemplates more adequate security than a township bond would afford, the size and boundaries of the townships being under the statutory control of the commissioners and subject to be changed by them. Rev., sec. 1318, subsec. 7.

## 5. Constitutional Law—Statutes—Interpretation.

The principle that when two constructions of a statute are permissible, the courts, in favor of upholding legislation, should adopt that which is in accordance with the organic law, does not apply when such would force a departure from the plain and natural significance of the words employed in the statute, and which the meaning and purpose of the law clearly tend to confirm and support.

## 6. Same—Test.

The test of the constitutionality of a statute is whether the statute authorizes an unconstitutional act, and not whether the act in a particular instance would be done with a beneficial effect.

## 7. Constitutional Law — Unconstitutional in Part — Courts — Appeal and Error.

Where a portion of a legislative act is alone presented on appeal and found to be unconstitutional, the Court may not properly consider the effect thereof upon other portions of the act, as to the constitutionality of such other portions, when not necessary to the decision.

WALKER, J., concurring in the result; CLARK, C. J., dissenting.

CIVIL ACTION heard on case agreed before his Honor, *W. A. Devin, J.,* at June Term, 1917, of WAKE.

From the facts as presented, it appears that O'Neal Township in Johnston County, having decided by popular vote to apply to the State for a loan of $40,000 to establish and maintain a system of public roads in said township, pursuant to the provisions of chapter 6, Laws 1917, entitled "An act to encourage road building in North Carolina by State aid," and the result having been duly certified to the Board of Commissioners of said county, that body passed a resolution to levy a special tax in said township at the approaching August meeting in 1917 to meet the obligations imposed by the statute, duly applied for said loan and prepared and tendered to defendant, the State Treasurer, the bond of the county in the sum of $40,000, promising to repay said loan and interest thereon at 5 per cent for forty-one years, payable semiannually, and to be computed at said rate on each installment of said loan from the date same should be advanced. Said bond contained provision, also, "That in default of prompt payment of said interest as it accrues, the said county of Johnston promises to pay the penalties prescribed by section 12, said chapter 6, and to observe and be bound by other provisions of the act." Accompanying the offer of the bond was a request from the Board of Commissioners that the Treasurer presently advance on said loan an installment of $15,000, etc. The same facts are applicable in case of Selma Township in said county, except the amount voted and total loan applied for was $50,000.

The defendant, the State Treasurer, declined to accept the bond and advance the money, contending:

"1. That the act was invalid.

"2. That the bond tendered was not in proper form.

"3. That the proposed tax levy was invalid," etc.

The court being of opinion with the plaintiff, so entered its judgment and directed that the State Treasurer pay the commissioners the amounts asked for in accordance with the provisions of the law.

Defendant thereupon excepted and appealed.

*F. H. Brooks for plaintiff.*

*Attorney-General and Assistant Attorney-General R. H. Sykes for defendant.*

HOKE, J. Chapter 6, Laws 1917, is a statute designed to enable the State to lend its aid to road building and maintenance in the counties, townships and road districts properly applying therefor under its provisions. In general terms, the scheme and purpose is that the State shall procure the money by issuing its coupon bonds, payable forty-one years from date, bearing interest at 4 per cent, and advance the money so obtained to localities applying for the same on receiving the bond of the respective counties promising to pay interest on the amount loaned

at 5 per cent for said period of forty-one years, this 1 per cent difference in the amount of interest to constitute a road fund to be invested by the State Treasurer, the purpose and estimate being that, if continuously and favorably invested for that period, there should be realized an amount sufficient to relieve both the State, counties and townships from ultimate liability. The loans are to be advanced by the State Treasurer in amounts as required, not to exceed the sum of $400,000 semiannually; and this is to continue for the period of forty-one years, involving, if carried out to its full intent and meaning, the incurring of a State indebtedness approximating $32,000,000. Provision is also made that if at any time there is any default in payment of the 5 per cent interest, as stipulated, the bond shall be put in suit for the amounts due and penalties attached; and if at the end of forty-one years the Treasurer has not been enabled to realize the full amount then due according to the scheme of loans and investment, the respective counties shall make good the deficit in proportion to the amount of the proceeds which such counties may have received.

After thus providing for obtaining the money in case of counties, the statute (in section 19) establishes a limit on the amount a county may borrow, the same not to exceed, in connection with other county indebtedness, 6 per cent of the assessed valuation of the property in the county; and in section 20 it is enacted as follows:

"Townships and road districts created by special act of the General Assembly may avail themselves of the benefits of this act upon compliance with the requirements herein set out: *Provided,* that the bond or undertaking filed with the State Treasurer shall be executed by the board or boards of county commissioners of the county or counties in which such township or road district is situated. It shall be the duty of such commissioners to levy and the duty of the sheriff to collect such special taxes and make payment thereof in the manner and under the penalty set out in section eighteen of this act."

The application for a loan in this case, being in behalf of two of the townships of Johnston County, comes more directly within the meaning of this section 20; and considering the same in reference to the terms employed and the other provisions of the statute and the general meaning and purpose of the law, it is clear, we think, that, whether the loan be applied for by county, township, or road district, the bond that is tendered shall be that of the county. No other than a county bond is anywhere mentioned in the statute, and in section 11 the statute itself says "said bond shall obligate said county to pay to the State Treasurer the 5 per cent interest per annum on the amount thus loaned," and when the provisions of the statute were extended to townships and road districts and the provision formally required that the "bond tendered

should be executed by the Board of County Commissioners," it plainly meant the bond that had been previously referred to and which the Board of County Commissioners would naturally give—the bond of their county. This is evidently the interpretation put upon it by the advocates of the measure as well as the actors in the present suit, for in this transaction (said to be brought as a test case), though the election and application are by two of its townships, the bonds are obligations of Johnston County. To hold otherwise would not only be a departure from the plain meaning of the language used, but would leave the proviso without substantial significance. And there is too controlling reason for such a requirement. A perusal of the statute will disclose that, while the bonds of the State are to be positive obligations so far as the creditor or holder is concerned, it was clearly contemplated that the State should be ultimately reimbursed for its outlay, and to this end proper security should be furnished. A county bond in all probability would do this, whereas the bond of a township or road district, without regard to its size or ability to pay and on which no limit in its indebtedness had been placed by the statute, except that it could only have its proportionate part in case the aggregate amount applied for should exceed semiannual loan of $400,000, might and often would fall far short of affording adequate security. It was for this reason no doubt that the proviso was inserted, and both its language and the facts and circumstances show that the framers of the statute intended that in all cases a county bond should be required. This being the correct and, to our minds, the only permissible construction of this section 20, we are of opinion that the Legislature is without power to require a county to give its binding obligation to pay the interest on a loan at 5 per cent for forty-one years on the application and vote of a township or road district for the construction and maintenance of the roads of the township or district.

On the facts here presented, an obligation of this kind imports a liability to taxation, and in case of a subordinate municipal corporation, it means that payment can be coerced, and that all the taxable values therein may be made available on the claim. As said in *People v. Township Salem,* 20 Mich., 452: "The exercise by a municipal corporation of the power to pledge its credit is an incipient step in the exercise of the power of taxation, and unless the object to be promoted be such as may be provided for by taxation, the power to make the pledge does not exist, and the Legislature cannot confer it." And a decision in this Court at the last term in *Bennett v. Commissioners of Rockingham* is in full recognition of the principle. True, both the levy and apportionment of taxation is very largely in the legislative discretion, and, when the power exists, it is very rarely if ever that courts

are allowed to interfere. It is true, also, that a State or county may,
as a rule, lend its aid or expend its money in the building and mainte-
nance of public roads anywhere within its borders when it is being done
for the public benefit or as a part of a State or county system, but in
this instance the improvement is entirely localized. The roads of the
differing townships or districts are set apart and a scheme is entered
upon by which they can be planned, constructed, and improved entirely
under township governance and without reference either to State or
county benefit; and when this occurs, the principle is presented that it
is not within the legislative power to tax one community or local taxing
district for the exclusive benefit of another—a principle which has been
directly approved in several recent decisions of this Court and is one
very generally accepted. *Keith v. Lockhart,* 171 N. C., 451; *Faison v.
Comrs.,* 171 N. C., 411; *Harper v. Comrs.,* 133 N. C., 106; *Commission-
ers Prince George v. Commissioners Laurel,* 70 Md., 443; *Lumber Co. v.
Township of Springfield,* 92 Mich., 277; *People of Salem, supra,* citing
*Lexington v. McQuillan's Heirs,* 39 Ky., 513; Cooley on Taxation (3d
Ed.), 420; Judson on Taxation, sec. 254; 37 Cyc., 749.

In the citation to Cooley on Taxation, speaking to the question, the
author says: "The taxing district through which the tax is to be appor-
tioned must be the district which is to be benefited by its collection and
expenditure. The district for the apportionment of the State tax is the
State, for a county tax the county, and so on. Subordinate districts
may be created for convenience, but the principle is general, and in all
subordinate districts the rule must be the same."

In 37 Cyc., *supra,* the principle is stated as follows: "The constitu-
tional requirement of uniformity of taxation forbids the imposition of
a tax on one municipality or part of the State for the purpose of bene-
fiting or raising money for another."

It is a fundamental principle in the law of taxation that taxes may
only be levied for public purposes and for the benefit of the public on
whom they are imposed, and to lay these burdens upon one district for
benefits appertaining solely to another is in clear violation of established
principles of right and contrary to the express provisions of our Con-
stitution, Art. I, sec. 17, which forbids that any person shall be dis-
seized of his freehold liberties and privileges or in any manner deprived
of his life, liberty or property but by the law of the land."

On the facts presented by this record, the position is further empha-
sized and conclusively determined in this jurisdiction · by reason of
another constitutional provision, Article VII, section 7, which provides
that no county, city, town or other municipal corporation shall contract
a debt, pledge its faith, or loan its credit, nor shall any tax be levied or
collected by any officers of the same, except for the necessary expenses

thereof, unless by a vote of the majority of the qualified voters therein." True, we have held in several well-considered decisions, that debts incurred and moneys expended for the building and maintenance of public roads are a necessary expense within the meaning of this section, but neither the decisions nor the principle on which they rest will sanction or approve the position that the road system of a township or road district under its local control and constituted for its special benefit is a necessary county expense, or that a vote of such township or district made for such purpose can establish a county obligation importing liability to taxation on the entire county and to which the voters of the county have not given their consent and are nowhere permitted and required to give it. On the contrary, it appears from a bare perusal of the relevant facts that such a localized road system can in no sense be considered a necessary county expense, and a statute, or that portion of it certainly which undertakes to establish a county liability for its construction and upkeep is in clear violation of this wholesome constitutional provision and must be declared invalid.

Recognizing the conclusive force of this position, it is contended for the applicants that the objectionable proviso in section 20 shall be so construed as to require only the execution of the township bond, and that the county commissioners, for the purpose, shall be held to act only as the representatives or agents of the townships and road districts for which the loan is made, and we are referred to various decisions of the Court where the commissioners have so acted, among others, *Edwards v. Comrs.,* 170 N. C., 448; *McCracken v. R. R.,* 168 N. C., 62; *Jones v. Comrs.,* 107 N. C., 248.

To give the statute such an interpretation, as we have endeavored to show, would be contrary to the natural import of the language and to add to the proviso in question words that it does not now contain, and, on the reason of the thing, we deem it well to note again that it is clear from a perusal of the entire statute that the State is to be ultimately reimbursed for this outlay, and to that end adequate security is to be furnished for the loans. A county whose boundaries are known and tax-paying ability recognized and established would very likely do this, whereas a township bond where size and boundaries are now entirely under control of the commissioners (Revisal, chap. 23, sec. 1318, subsec. 7) might, and no doubt frequently would, prove totally insufficient.

In view of these conditions, the only protection the State could prudently rely on was to require, as it has done, that, for township and district loans, a county bond shall be given, and the authorities cited tend rather to confirm than to antagonize this construction of the law, for in every one we have examined the statute construed, as plaintiffs contend, contained the provision in express terms that, in giving the bond,

it should be the "obligation of the township," or that "the commissioners should act only as agents of the township," terms that do not appear in the statute before us.

The principle is further urged upon our attention that, when two constructions of a statute are permissible, the Courts in favor of upholding legislation should adopt that which is in accord with the organic law; but such principle does not justify a departure from the plain and natural significance of the words employed and which the meaning and purpose of the law clearly tend to confirm and support. As said in 6 Ruling Case Law, sec. 77: "There are, however, limitations to the application of these principles, and Courts are not at liberty, in order to sustain a statute, to give it a forced construction which does not appear in the language enacted by the Legislature."

We are not inadvertent to the fact that thus far a tax only on the township applying for the loan is contemplated by the county commissioners, but, as we have seen, the bond to be given fixes an obligation on the county for the entire sum, and the statute provides that if there be default in paying the. 5 per cent interest for thirty days the entire amount due and all penalties shall "at once become due and payable" and enforced by action. And, as we have said in former decisions: "It is no answer to this position that, in the particular case before us, no harm is likely to occur or that the power is being exercised in a benevolent manner, for when a statute is being squared to the requirement of constitutional provision, it is what the law authorizes, and not what is being presently done under it, that furnishes the proper test of validity."

Applying these principles, and for the reasons stated, we are of opinion that section 20 of this statute is unconstitutional and void, and that the application for these present loans, which are entirely dependent upon it, were properly refused by the State Treasurer.

What effect the invalidity of this section may have upon the remaining provisions of the statute, and whether the general principles which forbid that, on the facts of this record, the cost for building and upkeep of a local road system for a township or road district be fixed upon a county will operate to prevent a State from incurring a large bonded indebtedness in aid of road building in the different counties are questions of gravest import which we do not now determine. They are not presented in the record and we do not consider it proper to decide them by anticipation. Speaking to this course, the Supreme Court of the United States in *Baker v. Grice,* 169 U. S., 284, says: "It is a matter of common occurrence—indeed, it is almost the undeviating rule of the Courts, both State and Federal—not to decide constitutional questions until the necessity for such decision arises in the record before the Court. This Court has followed this practice from the foundation of the Gov-

ernment." And in *Wellman v. R. R.,* 143 U. S., 339: "Such an exercise of the power is the ultimate and supreme function of Courts. It is legitimate only in the last resort and as a necessity in the determination of real earnest and vital controversy between individuals." And in *Liverpool, etc., Steamship Co. v. Commissioners Em.,* 113 U. S., 33: "It (the Court) has no jurisdiction to pronounce any statute, either of State or of the United States, void because irreconcilable with the Constitution, except as it is called on to adjudge the legal rights of litigants in actual controversies." In accord with these precedents and in full recognition of their fitness, we purposely refrain from determining the questions suggested, and confine our decision to the controversy actually presented in the record and dependent, as stated, on the validity of section 20 of the statute.

The suggestion that the State extends its aid in offering educational advantages to the people throughout its territory, and that it is at times made effective in certain designated localities, to our minds, is not apposite to the question decided in this appeal and not helpful to its proper solution. That is recognized and dealt with as a State-wide system under the control of general State officers, made imperative by special constitutional provision; and while aid is at times extended to certain localities where need is pressing, and through the agency of local officials, they are acting, as stated, in promotion of the general system and are in fact and truth performing official duties to that end.

There is error, and this will be certified to the court below that the action be dismissed.

Reversed.

WALKER, J., concurring in result: I cannot agree that section 20, chapter 6, of the Public Laws of 1917, requires that where the people of a township or road district vote in favor of a loan for road construction and maintenance that the bond shall be issued and tendered by the county as its independent obligation, and that it thereby becomes liable to the State thereon and must look to the township or road district which applied for the loan for reimbursement in case of any loss by it. It appears to me to have been intended that the bond should be issued by the county in behalf of the township or road district to be benefited, as has been done in similar cases mentioned in the dissenting opinion of the *Chief Justice,* and others might be added to them. This is the usual and customary method adopted in such cases and the method held by the majority to be that which was contemplated by the Legislature is not the usual one, but I believe the solitary instances in which the county has been made to assume solely and independently the obligation of a township or road district where the entire benefit would accrue to

the latter. It is contrary to the spirit, if not the letter, of our Constitution, and also is in violation of every principle of justice and equity, that one should reap the whole benefit and another be made to pay for it. The statute should be very clear, therefore, before we adopt such a construction of it and bring about such a result. I agree with the majority that such a law would be unconstitutional and invalid, and we should follow the rule of interpretation that even where the language is of doubtful meaning, we may call, in aid of a proper construction, the fact that the statute will be void if a certain meaning is given to it, while it will be valid if it receives another construction. Of course, we cannot force a construction for the purpose of sustaining its validity by avoiding any conflict of its provisions with those of the Constitution, but in this case I do not think we are driven to any such necessity, as the language of the statute will well warrant the construction that the obligation of the county will extend no further than the assumption of the debt or liability of the township, for and in its behalf only, and not as a separate obligation of its own. But if the bond to be issued, where a township or district applies for the loan, is that of the beneficiary alone, and not of the county, which acts merely as an agent in its behalf, it seems to me that even in such a case the bond may be void upon grounds not necessary to be now stated, nor until so grave and serious a question is directly and squarely presented and necessary to be decided. I do not say that a statute cannot be so framed as to avoid the constitutional difficulty, but I will decline to express an opinion upon the subject until a concrete case is presented which requires me to do so. It is sufficient for the present to say, that as the majority are of the opinion, and have so decided, that the bond to be issued and exchanged for a State bond of like amount, at a lower rate of interest, is that of the county, and as that decision must stand until it is changed, and must be taken as correct unless reversed, my view is that, in this aspect of the case, the statute, at least so far as it affects this particular suit, is invalid, being in direct conflict with the Constitution.

It is a principle which has been deeply rooted in our jurisprudence that no man's property shall be taken from him and devoted to private purposes or uses except upon fair and just compensation. The great opinion of *Chief Justice Ruffin,* in *Raleigh and Gaston R. R. Co. v. Davis,* 19 N. C., 451, established this proposition long ago beyond any question, and it never has been doubted since, but frequently affirmed in so many, perhaps, as a hundred cases. We have recently said, in *Lloyd v. Venable,* 168 N. C., at p. 535, citing *S. v. Hanie,* 169 N. C., 277: "The right to a just compensation for property taken by the sovereign or by any corporation possessing a part of the sovereign power, springs from our sense of natural justice," and "is a principle so salu-

tary to the citizen and concerns so nearly the character of the State" that this Court, in *R. R. v. Davis,* 19 N. C., at p. 460, declared it to be "an essential restriction upon the exercise of the power of eminent domain, even though no express provision may be found in our Constitution authorizing it, or requiring it to be made, when property is so taken for a public purpose; and we have adhered to this rule ever, since." And *Chief Justice Ruffin* said in *R. R. v. Davis, supra,* at pp. 455 and 456: "The right of the public to private property, to the extent that the use of it is needful and advantageous to the public, must, we think, be universally acknowledged. Writers upon the laws of nature and nations treat it as a right inherent in society. . . . When the use is in truth a public one, when it is of a nature calculated to promote the general welfare or is necessary to the common convenience, and the public is in fact to have the enjoyment of the property or of an easement in it, it cannot be denied that the power to have things before appropriated to individuals again dedicated to the service of the State is a power useful and necessary to every body politic. Theoretical writers have derived it from the original and full property, in its highest sense, existing in the community or sovereignty of the State before any division among individuals, and they deem the right of resumption for common use to be tacitly reserved by implied agreement. Thus derived, the power has the sanction of compact, which probably furnishes the motive for tracing it to this source as constituting a sanction founded in morals and nature. But practically, it is immaterial whether the right be supposed to have been impliedly reserved because it ought not to be granted, or because it is a portion of the national sovereignty which is inalienable by the Government, or whether the right is created by the public necessity, which at the time calls for its exercise; its existence in every State is indispensable and incontestible." He then gives different examples of the exercise of this power, in this way: "A familiar instance of the exercise of the power is the levying of revenue, by taking from the citizen, from time to time, such portions of his property as may be requisite to conduct the government instituted by the nation. Another instance essentially of the same character is that of devoting private property to public use as a highway. A nation could not exist without these powers, and they involve, also, the welfare of each citizen individually. An associated people cannot be conceived without avenues of intercommunication, and, therefore, the public must have the right to make them without or against the consent of individuals." He then further argues in favor of compensation as an inherent or a sacred right to be implied from several provisions of our Constitution, as follows: "The principle is, however, so salutary to the citizen and concerns so nearly the character of the

State that it may well be urged that it must be consecrated by its adoption in some part of the free Constitution of this State. We should be reluctant to pronounce judicially our inability to find it in that instrument. If it be not incorporated therein, the omission must be attributed to the belief of the founders of the Government that the Legislature would never perpetuate so flagrant an act of gross oppression, or that it would not be tolerated by the people, but be redressed by the next representatives chosen."

The clause of the Constitution that "no freeman shall be disseized of his freehold or deprived of his life, liberty, or property but by the law of the land" seems to have impressed him with the belief that it was intended in general terms, it is true, to protect the citizen from the taking of his property, either directly, by the exercise of the power of eminent domain, or indirectly, by the exercise of the power of taxation, without just compensation, for he also says that the "clause in question is restrictive of the right of the public to the use of private property and impliedly forbids it, without compensation," though not so obviously as other considerations.

"Under the guaranty of this article, it had been held, and in our opinion properly held, that private property is protected from the arbitrary power of transferring it from one person to another" is another clear and emphatic declaration in favor of the citizen and the enjoyment of his property without fear of having to surrender it, or any part of it, and receiving no just equivalent for the loss he thereby sustains. I could not cite a stronger or more conclusive authority to show that it is a well-recognized principle in our jurisprudence that no citizen can be made to give up what he has for another's exclusive benefit, and not even for the most important public purposes, without receiving a just compensation for it. But the question has been absolutely and forever settled by more recent decisions of this Court. *Harper v. Comrs.*, 133 N. C., 106; *Faison v. Comrs.*, 171 N. C., 411; *Keith v. Lockhart*, 171 N. C., 451; and the cases in the other jurisdictions, and the text-writers, support this position very strongly and almost, if not quite, unanimously.

The *Harper case* is sufficiently illustrative of the rule, and has been affirmed in numerous cases. There it is said, quoting two of the head-notes which accurately report the principle: "2. The Public Laws of 1903, chap. 554, if regarded as an act authorizing the imposition of special assessments, is invalid because it authorizes assessments on the real estate of the entire county, including the real estate of the township withdrawn from the benefits of the stock law and which would receive no benefits from the fences erected by the commissioners. 4. The Code, sec. 2824, providing that for the purpose of building stock-law fences the county commissioners may levy a special assessment on all

taxable real estate 'within the county, township, or district which may adopt the stock law,' does not authorize the imposition of an assessment on the real estate of a township withdrawn from the benefit of the stock law by express legislative enactment for the purpose of raising money to replace the money withdrawn from the general fund to pay the expenses of fences erected by the commissioners."

This righteous principle has been approved by every authority known of, because it is the one that contains the essence of honesty and fairness and the very germ of the moral law, and especially that of the Golden Rule. If we adopt any other principle it would lead to intolerable wrong and gross oppression. All the Judges now on this bench concurred in this principle of justice, as stated in that case, the *Chief Justice* and the writer of this opinion in the case itself and all that it decided, and the other members of the Court in subsequent cases by citing that decision and approving it without a dissenting or doubting word.

I believe in a strict adherence to those principles which are, or should be, the basis of all laws, without exception, whether they come to us from the body of the common law or the statutes enacted to adjust that great system of jurisprudence to present condition, or to supplement it by such new provisions as will round it out so that it may be adapted to modern requirements. Any man having a just conception of the rights of his neighbor, using that word in its broadest sense, must accept this doctrine as applicable to any phase of human life, for our laws are founded upon the Decalogue; not that every case can be exactly decided according to what is there enjoined, but we can never safely depart from this short but great declaration of *moral* principles without founding the law upon the sand, instead of upon the eternal rock of justice and equity. Do not exact from your neighbor what you would most unwillingly give up to him. It is, therefore, manifestly right that our law should have declared that nothing shall be taken from the citizen, whether in the form of seizure directly for public uses or indirectly by way of taxation, unless he is fairly paid for it, and that is the reason why every man is so deeply jealous of his property rights, for he rebels against an act of injustice. It is an innate principle and easily finds its expression in every constitution and generally in every statute where any invasion of the citizen's property is attempted. The Legislature never attempts, except in rare instances, to take from him that for which it does not pay, or for which it does not provide for payment. It cannot resist the united voice of man in a cry for justice and fair play.

So I say that the Legislature had no power to declare that the people of the county of Johnston, in this case, should be made to pay for that for which they do not receive, and cannot receive, any benefit. A con-

trary doctrine would lead to the gravest wrong and imposition and would put a weapon in the hands of the Legislature by which to crush and even destroy the citizen. We know that the Legislature would not consciously or advisedly use it, but that is not the question, which is one of conceding the existence of the power itself. Our system of government was built upon no such foundation. It was intended to stand forever (and we all confidently hope it will), and not to fall by its own iniquities and the weight of its own wrongs against the people. It is just because I firmly believe, and have a confident hope, in the perpetuity of our institutions that I give expression to these views, so essential to make that belief and that hope assured facts.

Referring once again to the authorities, my clear belief is that the very recent decision of this Court (*Faison v. Comrs.,* 171 N. C., 411; S. E. Rep., 481), which was approved by all of us, is decisive of this case. It presented the very question we have here to consider, and none of us *then* doubted, but all *unreservedly* agreed, that taxation of the many for the *sole* benefit of the few was not only unjust, but unconstitutional, and wholly in conflict with our sense of fairness and right. This has been the constant and unchanging view of this Court whenever the question has been presented to us for decision, and I hope it always will be, for whenever we reverse this wholesome doctrine it will open the gates to a flood of intolerably harsh legislation. The constitutional principle of uniformity, as all the authorities say, forbids the taxation of the many for the sole benefit of the few, or the taxation of the few for the sole benefit of the many. In whatever form this odious system appears, it is wrong, unjust and burdensome, and opposed to every just principle of law and of the Constitution. It must cease, or we can never redeem the promise which, by our compact, we adopted with the sanction of the people; they were assured that this shall be a government founded upon the right, and not one of injustice and oppression. Freedom and security of the weak against the strong and mighty can never exist under any other principle of government.

It appears to me that there is absolutely no analogy between the aid of this State to one township and that to its great *public* highways, such as the North Carolina Railroad, the Wilmington and Weldon Railroad, and the other great arteries of commerce within our borders extending across our entire domain and permeating nearly every section by their lateral branches. These are surely and essentially public highways of the first class, beneficial to the general public, and the very foundation of our hopes for the enlargement and development of our industries of all kinds. They affect the general public in a very material way, and their beneficial effect in promoting the general convenience and welfare and in contributing to the general prosperity cannot reasonably be

doubted. It was on this ground that the subscription of the State to their stock was upheld by this Court. But here we have the whole county paying for the construction of a neighborhood road within the confines of a single township and saddling its obligation to pay for this local benefit upon the other sections of the county which derive no benefit from it.

I would not utter one single word against road building in this State. Nothing contributes to the convenience, comfort, and prosperity of the people more than good roads, and if I entertained any doubt as to the validity of any statute providing for them it would quickly be resolved in their favor. In many respects they are of greater benefit to the State and her people than even railroads are, but we must not surrender a great principle of right and justice to a single cause, however deserving it may be, lest the concession once yielded and established may be recorded as a precedent, and thereby many evils may creep into the State. Better to do right all the time and tread upon the beaten way. It is safe and sound doctrine and has averted many misfortunes to those who would pursue the other course. A precedent, as Disraeli once so wisely said, embalms a principle, the product of wisdom and experience, and we do well when we follow it, at least so long as it is right. We must pursue this sane policy even against attack from every side, for it must be remembered that sometimes it is much easier to be critical than to be correct. *Jones v. Comrs.,* 137 N. C., 579, has no application to this case. There the Legislature merely required the county to pay its own legitimate debt. The other cases relied on by plaintiffs are no more in point.

My conclusion is, that if it was intended by this statute that the county should issue its own bond for the debt, the proper obligation of the township, which this Court now decides to be the case, the Legislature had no power under the Constitution to require it of the county, and that in this respect the legislation is void and of no effect. What the Legislature may do within its rightful power and how far it may go without exceeding it are questions not now before us. I believe that my conclusion is sustained not only by the cases decided by this Court which I have cited, but also by many decisions in other jurisdictions and the text-writers, which it is not necessary to collate, as our own cases are quite sufficient as authorities.

There is more difficulty in dealing with the larger question involved in the defense—that the entire statute is invalid—and I forbear to discuss it, as I cannot foreshadow in what particular form it will be presented, if it ever comes before us, nor upon what special facts. It is much too big a question to be anticipated by me alone, and as the majority have deemed it wise to pretermit any reference to it, I will follow

their example and also be silent, though I am not sure that in a certain phase of the case we would not be justified in giving expression to our opinion in regard to it; but, as I have said, it is better perhaps to wait until we are required to decide it before doing so, owing to its great importance and the far-reaching consequences of such a decision one way or another. This induces me to withhold my opinion.

We all will hail with gladness the day when a great system of highways will penetrate every section of the State, reaching to every city, town and hamlet, or easily accessible therefrom, producing a larger measure of social and commercial intercourse among our people, and thereby bringing them into closer communion, with a better and ever-increasing understanding of each other and of their common interests, resulting at last in a united endeavor to coördinate their efforts in behalf of the general welfare and prosperity, so that every citizen may ultimately and fully enjoy the blessings of our free institutions under our Constitution and laws. This will all come to us, we hope, some time, and we should strive without ceasing to hasten the day of its coming. But we should not begin this great work of internal improvement except in accordance with the Constitution and the sanction of the law. It may be that this act in other respects has such a sanction, and if not, the voters will soon have, if they see fit to take advantage of it, an opportunity to declare their supreme will concerning it.

CLARK, C. J., dissenting: The public policy of the State is vested in the discretion of the Legislature, except when the law-making body is expressly restricted by some provision of the State or Federal Constitution.

The public policy of the State as regards education and public roads is a matter of the closest interest to the public, for upon their development depends the progress and the prosperity of our people.

Up to within less than one hundred years, the public policy of our State left education solely in the hands of the parents, with the result that the great body of the people were uneducated, and the State suffered accordingly. When the system of public schools was inaugurated there was strong opposition by those who claimed that such system was Socialistic and compelled the well-to-do to pay for the education of the children of the poor. This argument, now antiquated and entirely discredited, was effective for many decades in halting the system within the narrowest possible limits. It is only in the last few years, and after a systematic education of public sentiment by broad progressive leaders, that a more adequate system of public education has set the State on the high road of progress.

Under our system of public roads, copied from the English common law, they were worked by the conscription of labor, hence mostly by the landless, who had no wheels to roll over the roads, while those whose lands were benefited by the roads were largely exempt from working them, either by being residents of the towns or very often above the conscript age. This system, known as *corvees* in France, was one of the potent causes of the great Revolution in that country. It was not only a thoroughly unjust system, but a most ineffective one, for the laborers feeling the injustice of being forced to work roads in which they had no personal interest, the roads in England and France and in this country were a clog upon travel and transportation. The "Mud Tax" was largely in excess of any benefit accruing to landowners and the property interests from their nonpayment of taxes for road building. *S. v. Covington,* 125 N. C., 644.

When public sentiment was awakened to the injustice and inefficiency of this system, gradually we began to authorize counties and townships to work their roads by taxation, or partly by taxation, as they saw fit, and this was held to be a matter entirely for the Legislature. *S. v. Sharp,* 125 N. C., 631-635.

The State has aided also in the building of a State Highway, and received some assistance in this measure from the United States Government, the intention being to build such highway from Beaufort to Ducktown, with lateral branches to be built gradually by the State, counties, or townships.

It being seen at once that this system would take a long time for development, there was finally proposed for public consideration this measure by which the most remote counties and most remote townships, even the poorest and those which have always received less benefit from State aid in any way, should have the same opportunity to construct efficient highways as the counties and townships near the large towns and in the wealthier sections. This measure, which was adopted as chapter 6 by the Legislature of 1917, has been for many years thoroughly discussed and considered by the people of the entire State, and has recommended itself by its affording equal opportunities to every section of the State, however remote. This bill, after thorough discussion before the people, was presented to the Legislature of 1911, passed in the House by an overwhelming vote, but was defeated by a small majority in the Senate. After the fullest discussion for another two years and a thorough debate in the Legislature in 1913 it passed the House by a unanimous vote and was again defeated in the Senate by a very narrow margin. It was again fully discussed for four years before the people, and in the General Assembly of 1917 it passed the House with only two dissenting votes and the Senate with only one dissent.

COMMISSIONERS *v.* STATE TREASURER.

A measure of such wide public interest, setting forth a State policy of prime importance to every section, having thus been discussed for years, having three times received an almost unanimous vote in the House and defeated by close margins twice in the Senate, and having been passed at the last session with only one dissent in that body, must be taken as expressing the will of a self-governing people and the almost unanimous opinion of the law-making department of the government that its enactment was within their constitutional powers. It should not, therefore, be set aside unless its unconstitutionality is clear "beyond all reasonable doubt," as the U. S. Supreme Court held is essential before the Court can assume to hold any act unconstitutional. *Ogden v. Sanders,* 12 Wheaton, 213, and hundreds of other cases cited in 6 R. C. L. in notes to sections 81-86 and 98-116.

In *Atkin v. Kansas,* 191 U. S., 223, it is said (*Harlan, J.*): "The public interests imperatively demand that legislative enactments should be recognized and enforced by the Courts as embodying the will of the people, unless they are *plainly and palpably, beyond all question,* in violation of the fundamental law of the Constitution." It can hardly be said that a measure which has been so long discussed, and which has received the approval of the people of this State, evinced by the votes of their representatives for three sessions of the General Assembly, and which is deemed constitutional by a minority of this Court, is unconstitutional "beyond question" and "beyond a reasonable doubt." In fact, there is no line to be found in our Constitution which authorizes the Court to hold an act of the Legislature unconstitutional any more than there is any authority in the Legislature to hold a decision of the Court unconstitutional. Neither department has supremacy over the other. The intention of the Constitution was that the Legislature should obey the Constitution; and if it did not, the authority to review its action is not given to the Courts, but rests with the people in the election of a new Legislature. In a majority of the States they have made this more expeditious by the adoption of the initiative and referendum, which requires, upon a proper petition, any statute to be submitted to the people immediately for approval or disapproval.

A measure of such wide and general importance is entitled to be considered before it is condemned. It does not appropriate, as has been suggested, $32,000,000. It is true that the plan provided for issuing State bonds at 4 per cent and receiving in exchange from each county receiving a loan from the State for itself, or its townships, a bond bearing 5 per cent interest is based on the calculation that the difference of 1 per cent properly handled will pay off the whole indebtedness at the end of forty-one years without costing the State or counties anything on the principal. But this does not require that the act shall be in force

forty-one years or shall cease after that date. It provides that "not more than $400,000 shall be issued each six months." The next Legislature, or any succeeding Legislature, can repeal the act, leaving outstanding only the bonds that have been issued up to that date; and the act does not necessarily stop at the end of forty-one years, but can continue indefinitely if it proves satisfactory to the people of the State. It proposes to create a State-wide system of modern public roads without costing the State a cent and costing the counties 5 per cent interest and no principal to repay.

The county issues no bonds to go on the market, but merely gives to the State its certificate of indebtedness for the amount loaned to the county for itself, or for one or more of its townships, if the people have so voted for building good roads, and the county is to collect from the whole county, if the county has voted for the loan, or from the township or townships which have voted from such loans from the State, 5 per cent on the loan annually and pay this over to the State, exactly according to the same plan by which for years the State has loaned money to the township or other local boards to build schoolhouses, for which loan the county has collected out of the township or locality and remitted the money to the State Board of Education.

The passage of this bill has been petitioned for by Farmers' Unions, Chambers of Commerce, Good Roads Associations and many others, for years. If it operates as its friends, and the Legislature contemplate, the people will be benefited by the immediate spending therein of the money loaned to the counties and townships. The dwellers in the rural districts will be relieved from the bad roads which are now the heaviest incubus upon agriculture in the State. The farmers will be relieved of the isolation which is the greatest drawback to rural life. The State will achieve a State-wide system of modern public roads extending, without exception, to every township and county as they successively adopt the measure; the townships and counties will have the good roads they desire, in a short time, by the payment of 5 per cent annual interest on the money borrowed for forty-one years, a moderate rental for the roads; and at the end of that time there will be no principal to pay either by the State, county or township, as the investment of the difference between the 5 per cent paid by the counties and townships and the 4 per cent paid by the State on its bonds will, in a sinking fund, amount to enough to pay off the State bonds, which will then return to the counties their bonds to be canceled.

The Secretary of State has already issued license to 50,000 automobiles in the State. With the successful operation of this bill the number will soon be doubled, and besides, motors will be used by farmers, instead of wagons, to carry their farm products to the towns or the nearest

railroad station. It is a safe calculation that if this carefully consid-ered action of the General Assembly is not set aside by this Court the increase in farm values and in farm products will in each township or county adopting this system far overpay the 5 per cent annual interest, which is all that they will be called upon to pay.

The same system has been successfully operated by Great Britain to remove the age-long grievance in Ireland of great feudal estates and absentee landlordism. Being able to sell her bonds bearing 2 per cent interest, England thus raised a large sum with which it bought up the vast landed estates in Ireland, which it took over by purchase or con-demnation, and cutting them up into small holdings, sold them to the former tenants at the same price per acre, adding a sum in money to each to furnish the farm, taking from the tenants their notes bearing 5 per cent interest. The difference between the 2 per cent and the 5 per cent in the course of a few years at compound interest paid off the pur-chase money for the lands and the money loaned, and the Government canceled the notes, giving the tenants fee-simple deeds, and all this not costing the taxpayers a penny and costing the tenants less than the rent would have been. The proposition here adopted by our Legislature pro-poses to abolish the age-long grievance of bad roads and isolation with-out costing the State a dollar and at an expense to the counties and townships of 5 per cent interest on the cost for forty-one years. The bonds for the principal, both those given by the State and those given by the counties, are then to be canceled out of the sinking fund.

We already have a statute by which the State loans out of the Treas-ury annually a certain sum of money, aggregating now over $600,000, at the rate of 5 per cent interest, for the purpose of building schoolhouses. These loans are made on long time, with annual installments, and have assisted in building hundreds of schoolhouses in North Carolina, and the State has never lost a dollar in its numerous transactions with the local school boards. The county boards of education sign a bond in the name of the county to whose local or township board the money is loaned, and the indebtedness thus becomes a county responsibility in precisely the same manner that is proposed in regard to loans to townships for good roads in this bill.

This "Road Law" now before the Court applies to good roads exactly the same proposition. The State proposes, in effect, to lend for the bene-fit of any township or county that will vote to tax itself for the purpose of building roads, thereby evincing their progressiveness and public spirit, certain sums of money, receiving therefor bonds (just as from local school boards) bearing 5 per cent interest, but not to exceed in the aggregate $400,000 each six months, and the State is to raise the sum thus loaned by the sale of its own 4 per cent bonds. This latter is a

detail which does not concern the counties and townships voting to build the roads. As to them, it is simply a loan of money by the State (just as to the local school board), and the State will raise the money by the sale of its bonds, which it has a right to do, for the statute was passed for a necessary purpose, with three readings in each house with the yeas and nays recorded on the Journal, as required by Const., Art. II, sec. 14. The Constitution, Art. V, sec. 4, authorizes this appropriation since the State bonds have been at par. The State does not, by this act, "give or lend the credit of the State in aid of any person, association or corporation."

The counties and townships are simply agencies of the State government. The Legislature can create, change, or abolish counties at will. It has abolished fourteen counties, and it abolished two others which it subsequently recreated, and has increased the number of counties to one hundred. It created the townships in 1868, and since then, under a general statute, has authorized the county commissioners to make others; and the Legislature also has created several townships, so that at present there are 1,055 townships in the State. Therefore, in putting money in the hands of the counties and townships to build roads, the State is merely putting its money in the hands of its own agents.

In *Atkin v. Kansas,* 191 U. S., 220, it is said: "Such corporations are the creatures, mere political subdivisions, of this State for the purpose of exercising a part of its powers . . . They are in every essential sense only auxiliaries of the State for the purposes of local government. They may be created or, having been created, their powers may be restricted or enlarged, or altogether withdrawn, at the will of the Legislature," citing many cases; among others, quoting from *Williams v. Eggleston,* 170 U. S., 310, as follows: "A municipal corporation is, so far as its purely municipal relations are concerned, simply an agency of the State for conducting the affairs of government; and, as such, it is subject to the control of the Legislature." The Court further said, quoting from *Clinton v. R. R.,* 24 Iowa, 475, with approval: "Municipal corporations owe their origin to, and derive their powers and rights wholly from, the Legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. If it may destroy, it may abridge and control." The Court added that the Legislature could, if it saw fit, abolish any and all of the municipal corporations of the State in one act, saying: "We know of no limitation on this right, so far as the corporations themselves are concerned. They are, so to phrase it, the mere tenants at will of the Legislature. The Legislature, therefore, when it advances money for a township to build public roads at the request of the people of the township, as evinced by a vote of its people (which is not necessary to its validity, *Kinston*

*v. Trust Co.,* 169 N. C., 207, for it is a necessary expense. *Hargrave v. Comrs.,* 168 N. C., 626) can place the money in the hands of the county to be used for such township, requiring the county, as one of its agents, to execute a certificate of indebtedness for the amount loaned to its sub-agent (the township) by the State, and require the county through its officers to collect the tax annually from such township to pay the 5 per cent to the State. This process of loaning the money to the township or other local board and requiring the county to give its note to the State for such sum and to collect and transmit the taxes from the township or locality has been in force since 1903, and has been approved by this Court, *Brown, J.,* in *Casey v. Dare,* 168 N. C., 285.

It has long been the policy of the State to give its aid to any local betterment which it has seen fit. It has never been doubted that the Legislature could create, at the cost of the entire State, a local public road, or a canal, of benefit to a restricted area, or a railroad whose benefits were more or less local, or establish any other local enterprise for the public benefit, in its judgment. Long ago the State thus authorized and aided the Clubfoot and Harlowe Canal—of almost purely local benefit, the Hyde County Canal, the Dismal Swamp Canal; also constructed the Quaker Road in Jones County, the Pender County Highway, the Hickory Nut Gap Road and other local public roads. It has also built at the State's expense, in part, the railroad from Weldon to Wilmington, passing through six counties (now eight), of small interest to the remainder of the one hundred counties of the State, which has become, however, of more general importance by reason of the subsequent connections. It also largely built the Raleigh and Gaston Railroad, passing through five counties; the Wilmington, Charlotte and Rutherfordton Railroad; the North Carolina Railroad; the Western; the Western North Carolina Railroad, and several others. All these enterprises were more or less of local benefit and of almost infintesimal benefit to large sections in other parts of the State.

These canals, public roads, and railroads were built by virtue of the sovereignty of the State and were paid for in cash out of the State Treasury, the money being raised by taxation or by the sale of State bonds, as the Legislature deemed best. It has never been doubted that the State could build a highway in any one of our hundred counties, or in any one of the 1,055 townships, and pay for it out of the State Treasury. Whether the money in the Treasury was raised by taxation or by the sale of State bonds, whether it was donated, or a loan, or an investment by the State, rested with the General Assembly. Frequently the State has issued its own bonds and received in exchange the bonds of the company or of the city or county contributing to build the road. This was done in building the Raleigh and Augusta Railroad, the Tay-

lorsville Roilroad (sometimes known as the "June-bug" Railroad) and other railroads and turnpikes. All these matters were in the judgment of the self-governing people of this State, as expressed by the action of the law-making body—our General Assembly.

The road law now before the Court is a carefully devised measure to give every township and every county that is willing to vote a tax upon itself the same benefit that every school district has obtained by voting an additional tax; but inasmuch as for building roads a larger sum is needed in the first instance, with only a small annual appropriation for interest, and the credit of the townships and counties might not be sufficient to float their bonds at par at a low rate of interest, the State offers to loan the money for the amount each township or county votes at 5 per cent, and proposes to raise the money for that purpose by selling its own bonds at 4 per cent, with the calculation that the 1. per cent difference in interest, properly invested for forty-one years, will result in returning the entire sum thus loaned to the State Treasury, the State in the meantime being benefited by the construction of a State-wide system of public roads in every township and in every county in the State. To avoid a scramble as to what townships and counties shall be first benefited, it is left to them to make the move, and thus select themselves. The result will be that the most progressive and wide-awake townships and counties, those who most feel the need of the good roads system, will be the first to profit by this beneficent movement. It will not be left, as in the past, for those communities which have the most influence in the Legislature to obtain priority in the State aid thus afforded. Successively each county and township will come in, in the order they themselves create, making a completed State-wide road system.

It is suggested that, not denying that the measure is valid and without passing upon that question which is of vast importance to the State at large and of the deepest interest to the public welfare, the Court (leaving that question undecided) can hold against those claiming aid in these two cases upon the ground that these plaintiffs, in both cases, are claiming under a township election, and that the Legislature could not authorize a county to give its bond to the State for a road improvement in a township.

Section 20 of the act before us provides: "Townships and road districts created by special act of the General Assembly may avail themselves of the benefits of this act *upon compliance with the requirements herewith set out: Provided,* that the bond or undertaking filed with the State Treasurer shall be executed by the board or boards of county commissioners of the county or counties in which such township or road district is situated. It shall be the duty of such commissioners to levy and the duty of the sheriff to collect *such special taxes* and make pay-

ment thereof *in the manner* and under the penalty set out in section 18 of this act." It is apparent that under this section it was intended that the counties in which these townships lay were to give their bonds as agents for the township, as has been done in very many instances where townships have voted appropriations for railroads or other public or *quasi*-public purposes, as in *Jones v. Comrs.*, 107 N. C., 248 (Person County); *McCracken v. R. R.*, 168 N. C., 62 (Alamance), and in numerous other cases.

The last lines of this section prescribe, after providing that "the bond or undertaking filed with the State Treasurer shall be executed by the board or boards of county commissioners of the county or counties in which such township or road district is situated" (evidently including cases in which a road district might lie in two or more counties), adds: "It shall be the duty of such commissioners to levy and the duty of the sheriff to collect *such special taxes* and make payment thereof in the manner and under the penalty set out in section 18 of this act." This places beyond question the intention of the Legislature that the county commissioners are to collect the taxes out of the township or road district to remit to the State Treasury, and that where the road district is in two or more counties the commissioners of each county shall collect from that part of the district in their respective counties. As it is provided that no county, township, or road district shall receive a loan amounting to more than 6 per cent of the assessed value of the property when added to the other bonded indebtedness thereof, there is no danger of the county not collecting 5 per cent annually on that amount from any township or road district.

An exactly analogous provision has long been in force as to building stock-law fences (Rev., 1685), which provides that the county commissioners may levy a special assessment on all taxable real estate "within the county, township, or district which may adopt the stock law." This act has been often held constitutional and that it does not violate the provision as to uniformity, and "does not authorize the imposition of an assessment on real estate outside of the district." *Harper v. Comrs.*, 133 N. C., 110.

It would seem clear that the language of section 20 of this act contemplates that the certificate of indebtedness given by the county commissioners for money loaned by the State to build roads in a township or road district is to be signed by the commissioners as agents for such township or road district, from which it is expressly provided that they shall collect such taxes and remit to the State Treasurer. However, a matter of this importance should not go off on such a technicality. Taking it that the act requires the county commissioners to sign the certificate and make the entire county responsible, as there is the further

provision that the county commissioners shall collect such taxes from the township or road district, as in the case of the stock law for townships or districts, there is nothing inequitable. But even if the county commissioners did not exercise such power, there is nothing in the Constitution which forbids the Legislature to require the county certificate of indebtedness, since the county commissioners have it in their power to collect from the localities. *Edwards v. Comrs.,* 170 N. C., 448, by *Hoke, J.* The county of its own motion can appropriate money to build roads in any one township in the county at its discretion. *Patterson v. Comrs. (Brown, J.),* 170 N. C., 503; *Edwards v. Comrs., supra.* A township whose roads are thus worked by the county can be required to levy a tax for the same, even without a vote, as roads are a public necessity. If so, when the State loans money to be used for building roads in a township, there is no reason the State shall not look to the county, if the Legislature so orders, to reimburse the State, as the county can collect the taxes from the township to reimburse itself. Both county and township are agencies of the State government, and this is not a matter forbidden by the Constitution, but purely a method of administration expressed through the Legislature by the people of the State. A case exactly in point is *Moss v. Tazewell County,* 112 Va., 878.

If the United States Government can, as it does, make appropriations out of the funds of the whole Union to make an improvement in a river, a creek, or a harbor; or the State can, as it does, appropriate from the Treasury out of the money of the whole State to build a local public road or a canal for a district or township, certainly the Legislature can require a county (if it had so chosen) to become responsible for a loan to build a road in one of its townships, especially when section 20 prescribes that the amount to repay it shall be collected by the township officials out of the property of that township.

The system of counties issuing bonds to work the roads in their townships and collecting out of each township the interest and principal as they fall due has often been followed, and a State-wide act to that purport was enacted, Laws 1913, chap. 122, recognized and amended. Laws 1917, chap. 207. If the present act is unconstitutional, the act of 1913, chap. 122, and all the bonds issued under that and similar acts are rendered invalid, which will be a public calamity.

In the matter of loans by the State to aid in building schoolhouses, it is provided that such loans to any locality shall be evidenced by the note of the county board, and that the county board shall deduct the amount of the annual payment from the district or township receiving the loan. Rev., 4053-4056. This system has worked well for the last fourteen years, and its legality has never been questioned.

In *Jones v. Comrs.,* 137 N. C., 598 (*Hoke, J.*), the Court held that the Legislature could pass an act to require a county to issue bonds for

indebtedness incurred for necessary expenses. Roads are a necessary expense, and when a township has thus voted to incur indebtedness for that purpose, and the State has agreed to loan the money, there is no reason why the Legislature should not take the obligation of the county (if that is what section 20 of this act means), leaving the county to collect, through its own officers, the annual interest from the township, in the meantime executing its own bond to the State for the amount thus loaned to the county for the benefit of that township. This case (*Jones v. Comrs.,* 137 N. C., 598) reversed a former decision on rehearing, and was therefore fully considered.

In *Jones v. Comrs.,* 143 N. C., 60, it was held that where certain townships, by extra taxation, procured the building through their territory of a railroad, "the Legislature has the power to direct the county commissioners to expend exclusively in those townships the county taxes derived from such railroad property in such townships, and that there is no constitutional requirement that the tax rate shall be the same everywhere; it varies in the different counties, and may vary in different townships, parts of townships, districts, towns and cities in the same county, for they are all legislative creations, mere governmental agencies, subject to be changed, abolished or divided and controlled, at the will of the General Assembly, especially at the control of the Legislature since the amendment (section 14) to Article VII."

The uniformity of taxation required by the Constitution means a uniform rate for the same object. It does not mean that there shall be the same rate of taxation throughout the State or throughout a county, or even throughout a township, for there are objects of taxation in some townships, districts, and counties for which tax is not laid in others. *Jones v. Comrs.,* 143 N. C., 60.

The will of the people has been fully gathered and clearly expressed in the passage of this act. It is a matter that closely affects the right of the people to govern themselves. It touches the interest of every section of the State. Heretofore, State appropriations for canals, for public roads and highways, and in the building of railroads have largely been procured in the interest of the influential and wealthier sections of the State. This act gives to the people of any township or county, however remote or poor it may be, the same opportunity to vote taxation upon themselves for the benefit of procuring public roads as is given to wealthier and more influential sections. It gives to the farmers and residents of remote townships and counties the same benefit of using the State credit in exchange for their own as is given to the larger counties and cities; it gives to the denizens of the mountain coves the same opportunity of obtaining good roads that is vouchsafed to the owners of rich river bottoms and of valuable suburban lands near the

cities. It is a case of "equal opportunity to all, without favor to any."

The cases quoted that one community should not be made to pay the debt of another has no application. The township is a part of the county. Besides, the county of Johnston does not propose to pay the tax for building the roads in Selma Township. The Johnston County commissioners could take the county money for that purpose. They are judges of what roads shall be worked with the county money. *Supervisors v. Comrs.* (Pitt County), 169 N. C., 548. The Legislature could, as it does, loan money to Johnston County (which is simply a State agency) to be used, in this instance, exclusively in building roads for Selma Township, if that township votes taxes to pay interest on the loan, and the General Assembly can require the county of Johnston, as such State agency, to execute its bond to the State for this money, since, through its county officers, Johnston County will collect the money out of the property of Selma Township. The county and the township are alike State agents, and if the Legislature sees fit to adopt this method, it is within the discretion of the law-making body.

The judge below (*Devin*) has properly, in my judgment, sustained, both in letter and spirit, the enactment by the General Assembly of this most just, beneficent, and progressive measure, which was adopted only after the fullest consideration by the people of the State and their representatives.