W. L. SLAYTON & CO. v. BOARD OF COMMISSIONERS OF CABARRUS COUNTY ET AL.

(Filed 20 December, 1923.)

1. **Municipal Corporations—Cities and Towns—Bonds — Sales — Bids—Conditions—Attorney and Client.**

    Where a competitive bidder for the purchase of municipal bonds makes his bid upon condition of approval by his attorney as to the legality thereof, the stipulation is a condition precedent to a binding agreement to purchase, and in the absence of bad faith, the stipulation will be upheld, though the attorney's opinion against the validity of the bonds proves to be erroneous.

2. **Same.**

    When the bidder for a proposed issue of municipal bonds incorporates in his written offer the condition that the municipality furnish certain record information of the proceedings leading up to and culminating in the issuance and delivery to the satisfaction of his attorney: *Held,* the record to be furnished was to afford the attorney reliable data for his opinion on the validity of the proposed bonds as a binding municipal obligation enforceable by taxation, and his opinion that the bonds would be legally invalid is binding between the parties, when made by the attorney in good faith.

3. **Same—Contracts, Written—Parol Evidence.**

    When a foreign bidder for the purchase of municipal bonds specifies in his written offer, in effect, that it was upon condition that the validity of the bonds be approved by the opinion of its attorney regularly employed for the purpose, verbal statements made by a local attorney at the time he submitted the bid that varies, alters, or contradicts the written stipulations cannot be received in evidence.

4. **Municipal Corporations — Cities and Towns — Bonds — Attorney and Client—Sales—Bidders—Good Faith—Evidence.**

    When a nonresident bidder for the purchase of municipal bonds refuses to accept them upon the adverse opinion of his attorney, made a con-

dition precedent to their acceptance by the terms of his bid, the fact that the opinion was not in accordance with an opinion recently rendered by the Supreme Court will not be considered as evidence of bad faith, upon the assumption that the attorney has seen the opinion of the Court, when it is made to appear that the attorney had investigated our statutes and decisions on the subject and there is no evidence that in giving his opinion he had acted in bad faith.

CLARK, C. J., dissenting.

APPEAL by defendant from *Webb, J.,* at April Term, 1923, of CABARRUS.

Civil action. The action is to recover of defendants a certified check, or amount of same, deposited with the defendants as a guarantee of good faith in their bid made in April, 1917, on a proposed bond issue of the county in the sum of $50,000, for the purpose of building a county home for the aged and infirm.

Defendants, denying plaintiff's right to a return of the check, or proceeds of same, alleged further and by way of counterclaim that plaintiffs wrongfully and in breach of their contract refused to take said bonds at their specified bid, and defendants were thereby compelled to sell said bonds to other purchasers at a loss to the county of $3,990, and the county suffered damages to said amount in addition to the $500 check which plaintiff had failed and refused to pay, etc.

The following issues being submitted to the jury:

"1. Is plaintiff the owner and entitled to the possession of the certified check in controversy and sued for in this action?

"2. What amount, if any is plaintiff indebted to defendant on the counterclaim?"

Evidence was offered by both parties, and at the close the court instructed the jury that on all the evidence, if the jury believed the same, they would answer the first issue "Yes" and the second issue "Nothing." Verdict and judgment for plaintiff, and defendant excepted and appealed.

*Morrison Caldwell for plaintiff.*
*L. T. Hartsell and H. S. Williams for defendants.*

HOKE, J. The facts in evidence tended to show that on 5 April, 1917, defendants having invited bids for a proposed bond issue of the county of $50,000 for the purpose of building a county home, plaintiff with others submitted their bid and deposited with defendants their certified check for $500 as an evidence of good faith, same to be credited on the price of the bonds in case plaintiff's bid was accepted and they became the purchasers. That plaintiff's bid was submitted in writing duly

signed by Bruce Craven as attorney for plaintiff, and same contained an offer of a premium for said bonds of $1,790, and also a stipulation in terms as follows:

"Prior to taking up and paying for said bonds you are to furnish us with a full and accurate transcript of the record, duly certified, of the proceedings leading up to and culminating this issuance and delivery of the bonds, to the satisfaction of our attorney. Herewith is our certified check for $500 as evidence of good faith in making this bid, which is to be retained by you and presented for payment as part of the purchase price of the said bonds, provided the same are duly awarded to us on this bid and delivered to us in accordance with the terms thereof at the Northern National Bank in Toledo, Ohio."

That plaintiff's being the higher bid, defendants, by formal resolution spread upon the minutes of the board and signed by them, accepted said bid and awarded the bonds to plaintiffs in pursuance of the terms of the same. That the records considered necessary appertaining to the proposed bond issue some time thereafter, about or just before 11 April, were forwarded to plaintiffs at Toledo, Ohio, and on being submitted to their regular bond attorney, W. H. Roose, he replied by letter of 16 April, asking for further data, and such data being furnished, said attorney, on 30 April, wrote a letter giving his opinion in formal disapproval of said bond issue, and containing among other things the following:

"It appears from the data now furnished that the above-mentioned bonds are being issued under the so-called inherent right of the county officials to borrow money for necessary expenses. This being true, there is no authority to levy a special tax for the payment of said bonds, but same would have to be taken care of out of the general county-purpose tax. It also appears that $105,000 of the outstanding bonded indebtedness of said county has been issued under a local law which authorizes the levy of a special tax to take care of same. This leaves $159,000 of such outstanding bonded indebtedness which must also be taken care of out of the general county-purpose tax.

"It appears from the certificate of the Register of Deeds of Cabarrus County, now submitted, that said county is now levying 47 2/3 cents on the $100 valuation for State and school purposes, 19 cents for county purposes, 30 cents special road, and 8 cents special interest and bridge fund. It therefore appears that there has already been levied in said county for State and county purposes 66 2/3 cents on the $100 valuation, not counting the special tax. This being the maximum amount of taxes which may be levied in any year, it is quite apparent that said county will be unable to levy the additional tax necessary to take care of this new issue of bonds. I am therefore returning to you herewith the transcript submitted without my approving opinion."

And the deposition of W. H. Roose, in reference to said bonds, and duly put in evidence, is as follows:

"I, W. H. Roose, of the city of Toledo, am a practicing attorney duly qualified and authorized to practice within the State of Ohio. I have been a practicing attorney for 35 years and a bond attorney almost exclusively for 20 years, and am still in the active practice of law, particularly bond law. I have my office at Room No. 740, Spitzer Building, Toledo, Ohio. On 11 April, 1917, W. L. Slayton & Co. submitted to me a transcript of the record of the proceedings of the Board of County Commissioners of Cabarrus County, North Carolina, relating to the issuance of $50,000 home bonds, and requesting my opinion as to the legality of the proceedings leading up to and including the issuance of said bonds.

"After a very thorough examination of the transcript of the record of the proceedings of said board relating to the issuance of said bonds, I advised W. L. Slayton & Co. that I could not approve said issue of bonds. I am attaching hereto copies of two letters I wrote to W. L. Slayton & Co., which contained my opinion rendered to them regarding the validity and legality of said bonds, the first letter dated 16 April, 1917, and now marked 'Exhibit A,' and the second letter dated 30 April, 1917, and now marked 'Exhibit B.' My opinion was made after a very thorough examination of the transcript and of the statutes and law of the State of North Carolina, and in entire good faith, and was based on my conviction that the construction of a county home was not a necessary expense as contemplated by section 7 of Article VII of the Constitution of North Carolina; and that even though it might be considered a necessary expense, the county was already levying taxes up to its constitutional limit."

There was also evidence of the good character and capacity of said attorney. Immediately on receipt of this opinion plaintiff notified defendant that they would not proceed further in the proposed purchase, and defendants were compelled to dispose of the bonds at a lower bid and with a loss to the county as stated.

It also appeared that defendants had duly tendered the bonds, claiming that there had been a definite contract of purchase at the price, which plaintiffs refused as stated, and some time thereafter, plaintiff having demanded a return of the check, defendants refused compliance, etc., and in suit entered therefor set up a counterclaim for damages incident to plaintiff's alleged breach of their agreement to buy the bonds.

It has been held by this Court, in cases where the question was directly considered, that where a bid for bonds has been made on condition of approval of the bidder's attorney as to the legality of the proposed bond issue, such stipulation is a condition precedent to a

binding agreement to purchase, and in the absence of bad faith, the position will prevail though the attorney's opinion prove to be erroneous. *Grant v. Board of Education,* 178 N. C., 329; *Webb v. Trustees,* 143 N. C., 299; *City of Rome v. Breed & Co.,* 21 Ga. App., 805.

In the *Webb case, supra,* the matter was discussed in a well-considered opinion by our former associate, *Mr. Justice Connor,* and it was there held as follows:

"Where the plaintiff proposed to purchase certain bonds issued by the defendant, 'when legally issued to the satisfaction of our attorney,' which proposition was accepted by the defendant, the approval of the attorney selected to pass upon the validity of the bonds, honestly and fairly expressed, was a condition precedent to the completion of the purchase.

"The correspondence or negotiation leading up to a proposition to purchase bonds is not material, where the proposition made by plaintiff and accepted by defendant was the result of such negotiation, and their relative rights and liabilities must be ascertained and declared upon the plain and unambiguous language found therein."

And in the subsequent case of *Grant v. Board of Education* the Court, in upholding this decision, and as pertinent to this inquiry, said: "On these, the pertinent facts of the controversy, the question chiefly presented was fully considered by us in *Webb v. Trustees,* 143 N. C., 299, and it was there held in effect that when the designated attorney, acting in good faith, has given an adverse opinion as to the validity of the bonds, the bidder was justified in refusing to proceed further, and in such case the conditional deposit is recoverable by the express terms of the agreement, and the position is not affected by the fact that the opinion of the attorney may have been erroneous, unless so arbitrary and capricious as to permit the inference of bad faith," citing further authorities: *Kinnicent v. Joint School Committee,* 165 Wis., 654; *U. S. Trust Co. v. Inc. Town of Guthrie,* 181 Iowa, 992; *City of San Antonio v. Rollins & Sons* (Texas), 127 S. W., 1166.

This being the principle as it prevails here, we can find no valid reason why the cases heretofore cited shall not be regarded as controlling on the facts of this record. It is contended for appellant that by the terms of the condition the attorney is not authorized to pass on the validity of the bonds, but only, and as a matter of form, on the regularity of the procedure leading up to the proposed issue, but this to our minds is not a fair or permissible interpretation of the condition expressed in the bid, and would in effect be to rob the stipulation of all significance. Considering the position of the parties, the purpose had in view, and the more reasonable meaning of the words used, it is clear, we think, that the "full and proper record" is to be furnished to

afford the attorney reliable data for his opinion on the validity of the bonds as a binding municipal obligation enforceable by taxation, and, so considered, the opinion of the attorney was well within the purpose and meaning of the powers contained in the terms of the bid. *Commissioners of Johnston v. State Treasurer,* 174 N. C., 141-145.

It is further insisted that the stipulation is of no effect because Bruce Craven, Esq., who submitted the bid for plaintiff before same was accepted, gave definite assurance that the record and bond issue would be approved by his principals. A proper perusal of the record will disclose, we think, that this statement of Mr. Craven was not intended or received as a contractual modification of the written bid submitted by him, but was rather by way of retort to the charge of an opposing bidder that the principals represented by Mr. Craven were in the habit of avoiding their bid when it suited them to do so, but if the evidence is to receive a different interpretation the position here may not avail the defendants because of the fact that plaintiff's bid was submitted and thereafter formally accepted in writing, and this, the express written agreement of the parties containing the condition of the attorney's approval, may not be varied by a previous or contemporary stipulation in direct modification of the written contract between them. *Improvement Co. v. Andrews,* 176 N. C., 280; *Mfg. Co. v. McCormick,* 175 N. C., 277; *Walker v. Venters,* 148 N. C., 388; *Bank v. Moore,* 138 N. C., 529, citing *Meekins v. Newberry,* 101 N. C., 18; *Ray v. Blackwell,* 94 N. C., 10.

In the impressive language of the present *Chief Justice,* in *Walker v. Venters, supra,* "The written word abides." And in *Ray v. Blackwell, supra, Smith, Chief Justice,* delivering the opinion, said: "It is a settled rule too firmly established in the law of evidence to need a reference to authority in its support that parol evidence will not be heard to contradict or alter the terms of a contract put in writing, and all contemporary declarations and understandings are incompetent for the purpose."

Nor is there any evidence tending to show that Mr. Craven had any authority to modify the terms of plaintiff's written bid, or that defendants in accepting the bid understood or acted in any belief in such authority. On the contrary, the only sworn testimony is to the effect that he was the attorney of plaintiff only to submit the bid of plaintiff in the terms and at the price specified, and to show that defendants so understood it, they submitted the data as to the procedure leading up to the proposed bond issue, and the circumstances attending it, to plaintiff's bond attorney in Toledo, Ohio.

As we have seen in the authorities cited, the mere fact that the attorney has given an erroneous opinion is without significance unless, as

SLAYTON *v.* COMMISSIONERS.

stated in one of the authorities cited (*City of San Antonio v. Rollins,* Texas), "The disapproval was fraudulent, capricious, and in bad faith," and in our opinion such a position cannot for a moment be upheld. True, as pointed out by appellant, this Court had directly decided, nearly a month before the opinion was submitted, and contrary to the same, that the building of a county home was a necessary county expense, and that a debt therefor could be contracted and taxes laid without a popular vote on the subject, but the facts in evidence do not disclose that the attorney knew of this or that he was likely to know of it, and assuredly the circumstances are not such as to permit an inference of fraud on his part concerning it. The opinion referred to, announcing the principle, was rendered at Spring Term, 1917, being filed 14 March of that year. It did not appear in our published Reports until the summer following, long after this transaction. Nor was it published in the S. E. until four or five weeks after it was filed. On the record, therefore, this matter was considered and the written opinion given by the attorney before the Court opinion in question appeared in any accredited publication likely to have come under the observation of the attorney, and the possibility that he might have seen it is entirely too vague to constitute legal evidence on an issue of fraud.

On authority apposite such a charge is not even made in the pleadings with sufficient definiteness to raise an issue of that kind. *Galloway v. Goolsby,* 176 N. C., 635-639; *Best v. Best,* 161 N. C., 514; *Mottu v. Davis,* 151 N. C., 237.

And assuredly there is no evidence to sustain such a charge against a man proved to be an honorable and capable attorney whose opinion shows that he had examined the matter with care and had given an opinion based on our published Reports, and so far as they were then reasonably accessible to him.

We think the charge of his Honor is in accord with the precedents applicable, and the judgment on the verdict is affirmed.

No error.

CLARK, C. J., dissenting: This is an action against the Board of Commissioners of Cabarrus County to recover possession of a certified check for $500 deposited with the defendants as evidence of good faith in making a bid for $50,000 county home bonds issued by the county. Plaintiffs subsequently refused to take said bonds, which defendants were compelled to sell at a loss of $3,790, and defendants set up a counterclaim for said amount of loss and $200 attorney's fees in finding another purchaser and effecting a sale to other parties, and retained said check to be applied on such counterclaim.

The defendants advertised for sale $50,000 of bonds of the county of Cabarrus, issued for the building of a county home, reserving the right to reject any and all bids. The plaintiffs filed the following offer:

"5 April, 1917. Board of Commissioners of Cabarrus: We offer you a premium of $1,790 in addition to par value, free blank bonds, and our attorney's fee and accrued interest, for your $50,000, 5 per cent county home bonds, advertised for sale this day, interest payable semi-annually and maturing $2,000 a year beginning at the end of the second year after date of bonds.

"Prior to taking up and paying for the bonds you are to furnish us with full and accurate transcript of the record, duly certified, of the proceedings leading up to and culminating in this issuance and delivery of bonds, to the satisfaction of our attorneys.

"Herewith is our certified check for $500 as evidence of good faith in making this bid, which is to be retained by you and presented for payment as part of the purchase price of the said bonds, provided the same are duly awarded to us on this bid, and delivered to us in accordance to the terms thereof, at the Northern National Bank in Toledo, Ohio.

"If any proposition shall be entertained by you in connection with paying interest on deferred payments on said bonds or on your bank balance from the proceeds thereof, we will equal any such proposition in addition to the above offer. Bruce Craven, Attorney for W. L. Slayton & Co."

Out of 10 or 15 bidders the plaintiff's bid was the highest; but before said bid was accepted by defendants, Bruce Craven, attorney for W. L. Slayton & Co., made a statement in explanation of his bid.

The defendants then asked the witness, L. A. Weddington, chairman board of commissioners, "State whether or not prior to the acceptance of the price offered by W. L. Slayton & Co. that Mr. Craven, their attorney, agreed to accept these bonds without any question as to the opinion of the attorney?" The answer to this question was objected to. Objection sustained, and defendants excepted. The witness would have testified and did, in the absence of the jury, testify as follows: "After the bids were all opened and the different prices compared, Mr. Craven's bid was the highest, and immediately afterwards one or two of the other bond buyers, one especially, told that Mr. Craven had been buying bonds at numbers of places for this same concern, Slayton & Co., and had been refusing to accept them; and they got into a regular melee, took quite a time to get them separated and quieted down. Then the suggestion was made to throw these bonds into an auction and sell them to the highest bidder. Craven objected, saying

that he was the highest bidder and felt that he was entitled to the bonds; and after consideration the county commissioners agreed that the advertisement was that the bonds would be awarded to the highest bidder; and when they said he would not pay for them, he would not take them, Craven assured us, guaranteed that the bonds would be accepted without an attorney's opinion other than his own."

"Q. I ask you if he (Craven) didn't state at the time that he knew the whole situation and he would guarantee the acceptance? A. Yes, sir.

"Q. Some statement was made that Mr. Craven had been buying bonds and not taking them; he and this party got into a fight? A. Craven told him he was a liar.

"Q. It was a kind of mix-up? A. Yes.

"Q. What was said by Mr. Craven in response to this other fellow? A. He appealed to the board of county commissioners. This man who had raised a row with him was the next highest bidder. After we got them settled down, some of the other bond buyers wanted to throw the bonds into an auction sale and let the highest bidder have them, and Craven appealed to the board that he came here at expense to buy the bonds and he was the highest bidder and didn't think it was treating him right to turn him down, which the board considered the fact after his saying that he guaranteed that he would take the bonds.

"Q. I ask you if you don't know it to be a fact that you and your board did not change one word or syllable of that written contract that Bruce Craven submitted? A. I have no knowledge of it, it never was authorized.

"Q. There wasn't any new auction? A. No, sir.

"Q. No verbal bidding by anybody? A. No, sir.

"Q. The only thing is, you claim that after this fellow charged him that he was in the habit of getting them and would not pay for them, he called the fellow a liar and claimed he would, and said he would take the bonds whether they were good or not? A. He claimed so. He said 'on no other opinion than his own.'

"Q. You didn't make him change his bid? A. No; it was not changed in his written contract. It may have been changed by Mr. Craven and the clerk to the board. The minutes were written up in his presence while the board was in session.

"Q. After the bids were all opened the board retired to themselves? A. Yes, sir.

"Q. They had declined to accept any of the written bids until they came back and Mr. Craven made this proposition? A. Yes, sir.

"Q. I ask you if he didn't state at the time that he knew these bonds were valid and all right and he would accept them? A. Yes, sir."

J. F. Harris testified for defendant: "I was register of deeds and clerk to the board of commissioners in the year 1917. As clerk to the board of commissioners it was my duty to keep the minutes of the board of commissioners. I have a record of the minutes of the board in reference to the proposal of Bruce Craven. This is the record of it, dated 5 April, 1917:

" 'Resolution. Whereas W. L. Slayton & Co., of Toledo, Ohio, are the highest and best bidders for the $50,000 county home bonds to be issued by Cabarrus County, dated 5 April, 1917, bearing interest at 5 per cent, payable semiannually, to mature as specified in their bid, bearing date of 5 April, 1917: Now, therefore, be it resolved, that the said bonds be and the same are hereby awarded to said W. L. Slayton & Co., and the chairman and clerk are hereby authorized and directed to execute said bonds, and when executed to deliver the same to the said W. L. Slayton & Co. on compliance with the terms of their said bid on file in the office of the clerk, which bid is as follows:

" 'We offer you a premium of $1,790 in addition to par value, free blank bonds, and our attorney's fees and accrued interest, for your $50,000, 5 per cent county home bonds, advertised for sale this day, interest payable semiannually and maturing $2,000 a year, beginning with the end of the second year after date of the bonds.

" 'Prior to taking up and paying for the bonds, you are to furnish us with a full and accurate transcript of the record, duly certified, of the proceedings leading up to and culminating in this issuance and delivery of bonds, to the satisfaction of our attorneys.

" 'Herewith is our certified check for $500 as evidence of good faith in making this bid, which is to be retained by you and presented for payment as part of the purchase price of the said bonds, provided the same are duly awarded to us on this bid, and delivered to us in accordance to the terms thereof, at the Northern National Bank in Toledo, Ohio.

" 'If any proposition shall be entertained by you in connection with paying interest on deferred payments on the said bonds, or on your bank balance from the proceeds thereof, we will equal any such proposition in addition to the above offer. (Signed) Bruce Craven, Attorney for W. L. Slayton & Co.'

"As register of deeds and clerk to the board, I furnished W. L. Slayton & Co. 'with a full and accurate transcript duly certified' by me. I gave them every information they asked me for; everything they wrote me concerning it I answered and mailed it to them. They never complained that I failed to do so. Yes, I think W. L. Slayton & Co. sent me the blank bonds to be executed. As well as I remember, those

bonds did come to us and we executed them and furnished the resolution and everything, and shipped them."

The court erred in excluding the above evidence of what occurred and of the guarantee by the attorney of the plaintiffs. On the next day after this transaction war was declared, and the bonds went down in price. On 19 April, 1917, W. L. Slayton & Co. wrote a letter to the plaintiffs in which they stated that certain questions had been raised as to the legality of the above bonds and as soon as that was established they would then proceed with printing the same.

The court erred in excluding the above testimony and in instructing the jury if they believed the evidence to accept the issues in favor of the plaintiff.

The language of the written bid cannot be construed ·to mean the *legality* of the bonds must be passed upon by their attorney. It is "not so nominated in the bond." The stipulation in the bid was "prior to taking up and paying for the bonds, you are to furnish us *with a full and accurate transcript of the record, duly certified,* of the proceedings leading up to and culminating in this issuance and delivery of bonds, to the satisfaction of our attorneys." This stipulation means simply that the *transcript of the record* must be furnished to the satisfaction of their attorneys. This, according to the evidence, was done. The testimony of the register of deeds is that he sent plaintiffs a full and accurate transcript of the record and "gave them every information they asked for."

There is no statement in the bid that the attorneys of the buyers were to pass conclusively upon the *legality* of the bonds before accepting them. It is certainly not so stated in their offer, and it would be preposterous to accept such a bid which would put every advantage in the hands of the bond buyers to reject bonds at any time should the market go down, and would violate the age-old maxim that no man can be a judge in his own case. See *Grant v. Board of Education,* 178 N. C., at p. 333. The true test is whether the bonds were legal and valid, and that is a matter for the courts and not for the purchaser at the highest bid to decide.

The testimony offered and rejected was that Craven, the accredited attorney of the plaintiffs representing them in person on this occasion, when the other bidders said that his clients would not pay for them and would not take them, "Craven assured us that he would guarantee that the bonds would be accepted without an attorney's opinion other than his own." This evidence explains *what attorney* would pass on them and does not contradict the bid, and this evidence should have been admitted as an essential part of the *res gestæ,* and the court should subsequently pass upon its binding power on the plaintiffs. He was

undoubtedly the plaintiff's attorney. He signed the bid which they had authorized him to make—"Bruce Craven, Attorney for W. L. Slayton & Co." In the letter written by Slayton & Co. on 19 April they stated, "When these bonds were offered for sale on 5 April by your county, *our representative and attorney for your State,* Bruce Craven, submitted a bid." This evidence, which was improperly excluded, did not contradict the written bid but explains and elucidates the bid by telling what attorney would pass upon the transcript of the record. *Johnston v. McRary,* 50 N. C., 369.

Exception 3 is as follows: "Q. You may state whether or not the county commissioners would have awarded these bonds to Slayton & Co. if there had been no other offer or proposition by Bruce Craven, attorney for W. L. Slayton & Co.?" Witness was chairman of the county commissioners, and his answer would have been, "They would not." The court erred in excluding the answer to this question because, if Craven had not said the bonds would be accepted without an attorney's opinion other than his own, the bonds would not have been awarded to the plaintiff.

There was further error set out in exceptions 4, 5, and 6, as follows: "The court charges you that if you believe all this evidence it would be your duty to answer the first issue 'Yes,' which reads, 'Is the plaintiff the owner and entitled to the possession of the certified check in controversy as sued on in this action?'"

If there was any evidence to the contrary, then the court erred in this instruction. As already stated, there was nothing in the written offer which says the bonds were bought subject to their *legality,* "To be determined by their attorneys." If that construction be placed upon said bid then Bruce Craven, whom the plaintiffs stated in their letter had authority to file said bid as attorney for W. L. Slayton & Co., told the defendants that said bonds would be passed upon by him as their attorney, and he has never yet given an opinion that the bonds were not legal. In fact there was neither then nor at any time any real doubt as to the validity of said bonds, for the legality of this very class of bonds had already been passed upon on 14 March, 1917, in the case of *Comrs. v. Spitzer,* 173 N. C., 147. If the attorney (Roose) had erroneous doubts, it did not invalidate the sale. Clearly the plaintiffs rejected their purchase of the bonds, which has cost the taxpayers of Cabarrus some $4,000, because, owing to the declaration of war the very next day, April 6, there was a slump in the price of bonds.

The county and other municipal officers in marketing bonds have always been at a disadvantage in dealing with bond buyers who by combination among themselves, or otherwise, have full opportunity to "chill the bidding," but it has never been held in our courts that the

highest bidder under a bid made by the admitted attorney of the bidder, who expressly stated at the time that he was authorized to make the bid, and who in a letter of 17 April by his clients was expressly admitted by them to have been authorized to make such bid, should be afterwards at liberty to reject such bid because, the market having fallen, another attorney of theirs then expressed a doubt as to the legality of the bonds. That is a matter which they should have investigated before making the bid, and if a doubt should subsequently arise it was a matter which should have been decided by the courts.

The phrase in the written bid requiring, as this does, that a certified record of the proceedings under which the bonds were issued should be submitted to the purchaser (which was done on this occasion), could not give the bidder the right to decide for himself as to the legality of the bonds, but would merely enable the purchaser to present any doubt as to the validity of the bonds to the courts. Otherwise the public are absolutely at the mercy of such bidders.

It may be noted that Mr. Craven not only stated unqualifiedly that he made the bid as attorney for the plaintiffs and deposited their $500 check by their authority as evidence of good faith, and at the session of the commissioners, when the bonds were awarded to his clients, unqualifiedly asserted that such bonds would be subject only to his approval as their attorney, and proved his good faith by entering into a personal difficulty to prove the integrity of his clients, but those clients subsequently in a letter of 17 April asserted that he was "their attorney for the State of North Carolina," and that never at any time since has Mr. Craven, by word or deed, thrown any doubt upon his assertion that he was duly authorized to buy said bonds, and he has given no indication since that he was not so authorized. Indeed it seems to be clear beyond question that the whole trouble arose solely because of the slump in the price of bonds which took place the next day upon the declaration of war. The purchasers, who had deposited $500 as evidence of their good faith, are now seeking to retract their bid, though the validity of such class of bonds had already been decided in this Court in the case above cited, *Comrs. v. Spitzer,* 173 N. C., 147, upon the very point upon which Attorney Roose expressed his doubt, and the identical bonds have since been sold, though at a loss, not caused by their invalidity, but owing to the war.

There has been nothing in the conduct of Craven, whom the plaintiff admitted to be their attorney for this State, to indicate that he has not acted in entirely good faith. It is the plaintiffs themselves, alone, who afterwards sought to withdraw their bid to the loss of many thousands of dollars to the taxpayers of Cabarrus and in bad faith to them and to the county commissioners, who, in reliance upon their good

faith as the highest bidder, lost the opportunity to sell the bonds to the next highest bidder or at public auction as the other bond buyers offered to do on that day.

There was error by the presiding judge in refusing the testimony of the county commissioners, as set out in the record, as to the transaction, and also in taking the case from the jury by instructing them to return a verdict in favor of the plaintiff if they believed the evidence. Men who deal with the Government, whether National, State or county, should learn that they must do so in the utmost good faith. There can be no possible question in this case that Craven made the bid for his clients with the fullest authority and in the utmost good faith, and he had done nothing to throw doubt upon this proposition or to indicate that he has repudiated his action. Whatever the motive of the plaintiffs in cancelling their bids, in regard to which there can be slight doubt, they had no right to do so. If they had any doubts about the validity of the bonds (as to which they should have satisfied themselves before making the bid), at least the legality of the bonds should have been tested before the courts. They could not decide the case in their own favor and to the loss of the other side. The cancellation upon the *ex parte* opinion of another of their attorneys is without excuse.

Even if the plaintiffs had the right to cancel their bid upon the opinion of another attorney than Mr. Craven, this Court had already decided more than a month before this occurrence, in *Comrs. v. Spitzer, supra,* that this very class of bonds was valid and, at the least, the good faith of that other attorney of the plaintiffs, who gave an opinion which served as an excuse to the plaintiffs to cancel their order when the bonds went down in price, should have been submitted to the jury upon all the evidence.

In protection to the taxpayers of North Carolina, whose rights have been so often sacrificed in such cases, the jury should have been allowed at least to have passed on the good faith of the plaintiffs in refusing to accept these bonds at a cost to the taxpayers of the county of Cabarrus of so many thousands of dollars. The counterclaim should have been submitted to the jury as well as the plaintiff's claim for return of the $500 which was deposited as a guarantee of the *good faith* which they have not proven to any jury, and hence are not entitled to recover.

The County Commissioners of Cabarrus heretofore saved their county and people from a heavy loss unjustly attempted to be imposed on them (as this Court held) in *Mfg. Co. v. Comrs.,* 183 N. C., 553.