OF

# NORTH CAROLINA

AT

# RALEIGH

## SPRING TERM, 1940

W. J. FLETCHER, FOR HIMSELF AND ON BEHALF OF ANY OTHER TAXPAYERS OF THE SAND HILL CONSOLIDATED SCHOOL DISTRICT OF BUNCOMBE COUNTY WHO MAY BE INTERESTED AND DESIRE TO MAKE THEMSELVES PARTIES PLAINTIFF, v. ROBERT C. COLLINS, JOHN C. VANCE AND HARRY L. PARKER, CONSTITUTING THE BOARD OF COUNTY COMMISSIONERS FOR BUNCOMBE COUNTY.

(Filed 19 June, 1940.)

**1. Schools § 27—**

The School Machinery Act of 1933, while providing for State maintenance of the public schools in all of the counties of the State, left the duty to provide for necessary capital outlay upon the several counties.

**2. Statutes § 2: Schools § 3—Article II, section 29, does not prohibit Legislature from setting up machinery under which county may establish special tax school districts.**

Article II, section 29, of the State Constitution prohibits the Legislature from passing any special, private or local act which *ex proprio vigore* undertakes to establish or change the boundaries of a school district, but the section does not proscribe the Legislature from setting up machinery under which a county, as the administrative unit charged with making provision for necessary capital outlay, may create school districts or special bond tax units within the county to accomplish this purpose, and therefore chapter 279, Public-Local Laws of 1937, which provides the machinery under which the county of Buncombe may establish school districts or special bond tax units in the county is not in contravention of this section of the Constitution.

1—218

**3. Constitutional Law § 6b—**

The Supreme Court cannot declare a statute unconstitutional and void where there is any doubt.

**4. Statutes § 10—**

An act applicable to one county alone is not repealed by implication as being contrary to the public policy enunciated in a statute having State-wide application and dealing with the same subject matter, passed at the same session of the Legislature, since the stronger indication of policy lies in the exception rather than the rule.

**5. Same—**

Where a special and a general statute dealing with the same subject matter are passed at the same session of the Legislature the acts are to be considered *in pari materia* and ordinarily the particular statute will prevail as an exception to the general statute.

**6. Same: Schools § 3—**

Chapter 279, Public-Local Laws of 1937, providing for the establishment of special tax school districts in Buncombe County *is held* not repealed by implication by the School Machinery Act of 1937, since the particular statute prevails as an exception to the general statute.

BARNHILL, J., dissenting.

DEVIN and WINBORNE, JJ., concur in dissent.

APPEAL by defendants from *Warlick, J.,* at March Term, 1940, of BUNCOMBE. Reversed.

Plaintiff, on behalf of himself and other taxpayers of Sand Hill Consolidated School District of Buncombe County like situated, brought this action against the Board of County Commissioners for Buncombe County to restrain the issue of certain bonds by the defendants in behalf of the school district named.

The case was heard before Judge Warlick, without the intervention of a jury, upon an agreed statement of facts, as follows:

"It is hereby agreed by and between counsel representing the plaintiff and counsel representing the defendants that the following constitutes the facts in controversy between the parties:

"1. That pursuant to chapter 279 of the Public-Local and Private Laws of North Carolina, Session 1937, the Board of Education of Buncombe County in accordance with the terms of said statute created the Sand Hill Consolidated School District of Buncombe County, a school district or special bond tax unit, and pursuant to said action of the Board of Education of Buncombe County the Board of County Commissioners of Buncombe County, in strict compliance with the terms of said statute, ordered an election in said district or bond tax unit to be held Tuesday, October 3, 1939, at which election a majority of the qualified voters of said district voted in favor of the issuance of $100,000.00 school bonds and/or notes and the levying of a sufficient tax *ad valorem* on the

taxable property within the district for the payment thereof for the purposes of acquiring, erecting, enlarging, altering and equipping school buildings or any one or all of said purposes, and that pursuant to said election the Board of County Commissioners in accordance with the terms of said chapter 279, canvassed the returns of said election and complied with the statute with respect to declaring the results of said election and giving notice thereof.

"2. That pursuant to the authorization aforementioned, the Board of County Commissioners of Buncombe County unless prohibited by order of court proposes to issue bonds and/or notes in the amount of $100,000.00, to be paid both principal and interest from taxes levied exclusively on the taxable property within the Sand Hill Consolidated School District for the purposes authorized in said chapter 279.

"3. That the Sand Hill Consolidated School District of Buncombe County comprises the identical territory as that contained within the limits of the Sand Hill Administrative School District created by order of the Board of Education and with the approval of the State School Commission in 1933 under the provisions of chapter 562 of the Public Laws of North Carolina, Session 1933.

"AND IT IS FURTHER AGREED by and between counsel for the plaintiff and the defendants that the sole question involved in this action is whether chapter 279 of the Public-Local and Private Laws of 1937 violates the provisions of Article II, section 29, of the Constitution of North Carolina."

The statute referred to is too long for detailed quotation. In substance it provides that upon a petition of not less than ten per cent of the qualified voters of the territory affected such territory shall be created into a school district and that bonds or notes shall be issued under the provisions of the act, payable exclusively out of the taxes levied in the district, for the purpose of erecting school buildings therein, etc.

Upon pertinent findings of fact, the trial court concluded that the pertinent statute—chapter 279, Public-Local and Private Laws of North Carolina, Session of 1937—is in conflict with the provisions of Article II, section 29, of the Constitution of North Carolina, prohibiting the General Assembly from passing "any local, private, or special act or resolution establishing or changing the lines of school districts" and is, therefore, void and constitutes no authority for issuing the proposed bonds.

Judgment was, therefore, rendered, permanently restraining the defendants from issuing the bonds and from levying the necessary tax to pay the principal and interest thereon. From this judgment the defendants appealed.

*W. A. Edgerton and Zebulon Weaver, Jr., for plaintiffs, appellees.*
*Brandon P. Hodges and Claude L. Love for defendants, appellants.*
*Joseph C. Whisnant for County Board of Education of Cleveland*
*County, and Masslich & Mitchell, of New York City, as amicus curiæ.*

SEAWELL, J.   The School Machinery Act of 1933 abolished all exist-
ing special tax districts in the State, including special charter districts,
and automatically deprived all school districts of the power to issue
bonds or create debt.   Such districts were continued only as tax-collect-
ing districts for the liquidation of debts already incurred.   Subsequently,
the debts of many of these districts were taken over by the counties,
under powers expressly conferred by law or under decisions of the Court
approving such action as lawful.   The effect of this legislation was to
leave the several counties solely responsible for furnishing school build-
ings and certain other school facilities.

*Mears v. Board of Education,* 214 N. C., 89, 197 S. E., 752, illustrates
the inadequacy of existing general laws to meet this requirement, and the
inability of communities in need of school facilities to procure relief
under them by court action, however great the emergency.

The difficulty and delay thus experienced were enhanced by the wide-
spread financial distress which made some of the counties unable and
others, perhaps, unwilling to exercise a discretion favorable to the erec-
tion of school buildings.   Several counties of the State, perhaps eleven
in number, secured legislation similar to the act under consideration,
permitting the communities within such counties to proceed on the prin-
ciple of self-help.   Many thousands of dollars in bonds have been issued
and sold under such laws and school buildings have been erected.   The
machinery in all the acts is strikingly similar.

While, of course, the primary purpose of the act under consideration
was to create a taxing district so that necessary facilities for conducting
the schools might be provided by the community itself, at its own
expense, there is no need to evade the fact that school districts are thus
created, or may be created under the law, anywhere in the county upon
compliance with the conditions named in the act.

We do not think it necessary here to go more minutely into distinctions
between laws that are general and uniform as to all parts of the State
and those which are special, local, or private.   The field is controversial
and it will be found that in many instances laws are general, special,
or local merely by way of contrast.   The law applying to a whole
county in which numerous school districts might be created cannot be
classed as private or special.   As to whether a law may be called local
is often to be determined by the "facts and circumstances of each par-
ticular case."   *In re Harris,* 183 N. C., 633, 112 S. E., 425.   Some laws,

which must of necessity apply to all persons of the particular class selected throughout the State at the risk of offending against the constitutional provisions against discrimination, have been pronounced local because they applied to only a few counties in the State. *S. v. Dixon,* 215 N. C., 161, 1 S. E. (2d), 521. Since, however, a county must be considered a unit, so far as its responsibility for furnishing school facilities is concerned, as well as for the purpose of division into school districts, it may well be questioned whether an act providing for the creation, not of one particular school district within the county, but the creation of any number of them, under its machinery, could properly be called "local." *In re Harris, supra.*

The question presented is one of first impression, since the decisions of this Court striking down legislation purporting to establish school districts as in opposition to Article II, section 29, of the Constitution, have applied to the attempted creation of a single or special district. *Robinson v. Comrs.,* 182 N. C., 590, 109 S. E., 855; *Galloway v. Board,* 184 N. C., 245, 114 S. E., 165; *Trustees v. Trust Co.,* 181 N. C., 306, 107 S. E., 130; *Sechrist v. Comrs.,* 181 N. C., 511, 107 S. E., 503. The precise question involved here is different. However the act is labeled, it is our opinion that the constitutional provision cited does not prevent or forbid the creation of school districts by the method set out in the act applicable to any district which may be so created in the county.

It will be observed that the act in question prescribes a method whereby school districts or special bond tax units may be uniformly established throughout the county. The act itself deals only with the mechanics of establishing or changing the lines of school districts or special bond tax units, and does not, *ex proprio vigore,* undertake to establish or to change any such lines. These are matters which, in terms, are committed to the sound discretion of the county board of education. The constitutional prohibition as respects the matter now in hand is against direct action on the part of the General Assembly and not against the establishment of machinery for the accomplishment of these ends.

In *Trustees v. Trust Co., supra,* and again in *Sechrist v. Comrs., supra,* it was inadvertently stated that this constitutional inhibition was directed against the passage of any local, private or special act "relating to establishing or changing the lines of school districts." The word "relating" is used seven times in the section. It does not appear in connection with the prohibition against establishing or changing the lines of school districts. The elusion is significant. The difference was not material in the cited cases, as both of the acts there considered were clearly prohibited, but in the instant case the precise meaning of the section is important.

In cases like this it is incumbent upon us to remember the limitations

which have been wisely set to the power of this Court in dealing with the acts of the Legislature. We cannot declare them unconstitutional and void where there is any doubt. *Hood, Comr., v. Realty, Inc.,* 211 N. C., 582, 191 S. E., 410; *S. v. Brockwell,* 209 N. C., 209, 183 S. E., 378; *Glenn v. Board of Education,* 210 N. C., 525, 187 S. E., 781; *Albertson v. Albertson,* 207 N. C., 547, 178 S. E., 352; *Wells v. Housing Authority,* 213 N. C., 744, 197 S. E., 693.

The litigant parties agreed that the sole question presented to this Court was whether the act under consideration is offensive to Article II, section 29, of the Constitution. A careful consideration convinces us that the study given to the case by counsel on both sides of the controversy has led them to a correct conclusion in this regard.

Questions of policy derived solely from statutes can be of little avail in determining the priority or potency of separate statutes upon the same subject where there is a suggested conflict. Certainly the same power which creates a policy may destroy it, or modify it, or make exceptions, or do with it as it will; and frequently the stronger indication of policy lies in the exception rather than in the rule.

It has been suggested here that because the School Machinery Act of 1933 has provided a uniform method by general law for redistricting the counties of the State a policy has been produced which will not tolerate amendment or exception. The suggestion is that the School Machinery Act of 1937, having vested in the State School Commission "all the powers and duties heretofore conferred by law upon the State Board of Equalization and the State School Commission, together with such other powers and duties as may be conferred by this act," this board has now the exclusive power to divide the counties into school districts. But such power as the School Commission has been given, under this law, is clearly subject to such exceptions and modifications as had been previously made; and the repealing clause must be held advertent to the rule that the particular act is considered an exception to the general act, and not in contradiction of its terms. *Hammond v. Charlotte,* 205 N. C., 469, 171 S. E., 612.

It is recognized that a comprehensive law may bear internal evidence that it is intended to be exclusive upon the subjects with which it deals, and where the repealing clause is of sufficient character to carry out such intent, other statutes upon the subject must give way. This, however, is nothing more nor less than repeal by implication, which is not favored in the law.

The statute under consideration and the School Machinery Act were passed at the same Legislature and are, therefore, to be construed as having been enacted at one and the same time. They are to be considered *in pari materia* and, as stated, it is the prevailing rule that the

particular statute shall prevail as an exception to the general statute. *Bramham v. Durham,* 171 N. C., 196, 88 S. E., 347; *Rankin v. Gaston County,* 173 N. C., 683, 92 S. E., 719; *Hammond v. Charlotte, supra.* A proper construction of these statutes must reconcile them under this rule, which is so clearly expressed in *Felmet v. Comrs.,* 186 N. C., 251, 119 S. E., 353.

It has been said that the policy of the State is epitomized in the expression, "An equal educational opportunity for every boy and girl in the State." Equality in educational opportunity must not be achieved by a leveling down process. We find no public policy in this State which can be invoked to nullify the statute and suppress initiative in educational advancement in communities which have greater resources or more faith, and are willing to translate them into tangible educational facilities. The law intended they should have this power. We see no reason to depart from the ordinary rules of statutory construction in an attempt to invest the public school laws with a legalistically satisfying but devitalizing symmetry which would destroy it.

We are speaking of the building of schoolhouses, not of the maintenance of the schools. When the State took over the maintenance of the public schools, it did not take over the business of building schoolhouses. The law simply abolished all taxing districts, including special charter districts, to, which the great advance in the building program had been largely due. To call the resulting condition one of uniformity is to tax optimism. There are one hundred counties in the State, each with its own difficulties and problems, some of which seem to be almost unsolvable. There are one hundred governing boards, composed of men who have widely different ideas upon this subject and with a discretion which may be exercised and reflected in widely divergent standards throughout the State. Under such conditions the recognition of community initiative seems to be as imperative as it has ever been. At any rate it is our opinion that the Legislature was acting within its constitutional limitations in enacting the law under consideration and that it is not invalidated or repealed by any general law.

The judgment of the court below is
Reversed.

BARNHILL, J., dissenting: The question here presented involves an interpretation of Art. II, sec. 29, of the North Carolina Constitution which places certain limitations upon the power of the General Assembly to enact private, local or special legislation. The pertinent part thereof reads as follows:

"The General Assembly shall not pass any local, private or special act . . . establishing or changing the lines of school districts; . . .

nor shall the General Assembly enact any such local, private or special act by the partial repeal of a general law. . . . Any local, private or special act or resolution passed in violation of the provisions of this section shall be void. The General Assembly shall have power to pass general laws regulating matters set out in this section."

In the interpretation of the meaning of the word "local," as used in this section, we must do so as that term is contra-distinguished from the word "general" as used in the same section.

Having due regard for the language of the section as a whole it seems clear that "local" and "general" are to be given their usual and ordinary meaning. *Local means belonging or confined to a particular place or locality. A local law is one whose operation is intended to be restricted within certain limits less than the limits of the legislative jurisdiction. Though restricted in its operation to a particular territory, it may be either public or private. It is local because it is operative in a limited jurisdiction only.* On the other hand, *general means common to all or to the greatest number. A general law is one framed in terms restricted to no locality and operating equally upon all.* Callahan, Cyc. Law Dict. If the act applies to restricted territory it is local even though it may be public. It is general when it is State-wide in application.

That, to be general, a law must be State-wide in scope was modified by this Court in *In re Harris,* 183 N. C., 633, 112 S. E., 425; but the rule was followed in *S. v. Harris,* 216 N. C., 746.

This interpretation, which seems to be the clear intent of the section, is fortified when we consider the evil that the people sought to remedy when the amendment was adopted. It had come to be that the major portion of the time of the Legislature was consumed in the consideration and passage of private acts, special acts and acts, though public in character, which were limited to a restricted territory—usually one or more counties. This was so to such an extent that it had become an evil to which the people sought to put a stop by the adoption in 1916 of this section of the Constitution. This evil is graphically illustrated by the brief history of the financial affairs of Buncombe County set out in the brief of defendants.

Article II, sec. 29, of the Constitution expressly withdraws from the Legislature the power to create a school district. This, I understand, is conceded, and it has been so held by this Court. *Galloway v. Board of Education,* 184 N. C., 245, 114 S. E., 165; *Sechrist v. Comrs.,* 181 N. C., 511, 107 S. E., 503; *Trustees v. Trust Co.,* 181 N. C., 306, 107 S. E., 130; *Robinson v. Comrs.,* 182 N. C., 590, 109 S. E., 885; *Woosley v. Comrs.,* 182 N. C., 429, 109 S. E., 368.

How then can the General Assembly delegate to a county board of education or to other local authorities a power it does not possess?

This is not answered by the assertion that the act deals only with the mechanics. The county board of education has no inherent power to create a school district nor does it possess other statutory authority so to do. It derives its authority from this act. Delete the authority to create a district and the act is meaningless. Eliminate the creation of a district and the other action of the county authorities is void.

Thus it has been expressly held by this Court that the provisions for bonds and taxation to carry out the purposes of an act unconstitutionally creating a school district are void. *Trustees v. Trust Co., supra; Sechrist v. Comrs., supra; Armstrong v. Comrs.,* 185 N. C., 405, 117 S. E., 388. In the *Sechrist case, supra,* the Court expressly declined to reconsider the *Trust Co. case.*

The Legislature may not delegate power which directly contravenes constitutional provisions. 16 C. J. S., 407; *Arnold v. Sullenger,* 254 Pac., 267. The exercise of power by a subordinate agency delegated to it is the same in effect as if such power were directly exercised by the Legislature. 16 C. J. S., 412; *S. v. Morwood,* 57 S. W., 875. The power to delegate authority is subject always to the rule that the Legislature may not authorize the exercise of any power or the doing of any act which exceeds or transgresses its constitutional limitation. It may not authorize others to do what it is forbidden to do. "A stream may not rise higher than its source."

Clearly the primary purpose of the act is to authorize the creation of school districts. The provisions for bonds and taxation are merely incidental—though essential—to the primary purpose.

The act is captioned in part: "An act to authorize creation of school districts." The body of the act provides that upon the hearing of a petition signed by not less than 10% of the qualified voters of a designated territory requesting the creation of a school district, etc., "the board of education . . . may grant such petition and enter an order creating a school district, comprising either the territory described in such petition or a part of such territory and additional territory." It then provides for the naming of the district so created. It is then, and only then, that the board of education may petition the county authorities for an election. Having authorized the creation of the district and the issuance of bonds and the levy of a tax in furtherance of the purposes for which the district was created, it was essential that the Legislature prescribe the mechanics and the method of procedure so as to make the delegation of authority effective.

It is to be noted that while, under the act, a district may be formed without the election or the issuance of bonds, both the holding of the election and the issuance of the bonds are dependent upon the prior creation of a district.

It is also to be noted that in creating a district the board of education is not limited to the territory described in the petition but it may create a district "comprising either the territory described in such petition or a part of such territory and additional territory." This authority carries with it plenary power not only to establish a district but also to change the lines of existing administrative districts for the power to include other territory in the proposed district is not limited. It is left to the board of education to determine and to describe the lines of the new district—a power withheld from the General Assembly by the language of the section.

Our present Constitution in Art. IX, sec. 2, provides that "The General Assembly, at its first session under this Constitution, shall provide by taxation and otherwise for a general and uniform system of public school, wherein tuition shall be free of charge to all children of the State between the ages of six and twenty-one years."

If time and space would permit it would be interesting to trace fully the history of school legislation under this provision and to note the various evasions of the solemn duty thus imposed upon the General Assembly before it finally in fact provided a general and uniform system of public schools.

Suffice it to say that for many years after the adoption of the Constitution, due to the prevailing economic conditions and the belief of many that "the taxation of the rich for the education of the poor is socialistic," no real substantial effort was made to provide an adequate school system. As a consequence, we had the one-room, one-teacher school for a four months' term in many communities and no school at all in others, until the Aycock era. Then, at the turn of the century, Aycock, aided by McIver, Daniels and other contemporary leaders, inaugurated an educational renaissance in North Carolina.

The first result was the creation of local taxing units and local charter districts in those communities best able to pay the tax. This resulted in an unequalized patchwork school system in that the prosperous communities were provided with adequate modernized schools while rural, sparsely settled communities were left without adequate facilities or funds.

The General Assembly first attempted to remedy this condition by providing gradually enlarged equalization funds. This in turn proved inadequate and failed to meet the constitutional requirement. So for the first time, in 1933, the Legislature undertook to meet squarely the constitutional mandate by enacting ch. 562, Public Laws 1933, which was an act "to provide for the operation of a uniform system of schools in the whole of the State for a term of eight months without the levy of any *ad valorem* tax therefor."

The outstanding features of the change from a localized, unbalanced and patchwork system to a State-wide, unified plan of organization and operation are:

(1) The abolition of local charter, bond and tax levying districts.

(2) The elimination of land tax for support of the constitutional term.

(3) Prohibition of tax levies except as allowed in the general law.

(4) The designation of the counties and the city charter districts as the local administrative units operating under the direction and supervision of the State School Commission.

(5) The operation of all schools under a unified State-wide plan with funds provided by the State derived through taxes other than upon real property.

(6) The requirement that capital outlay funds for buildings and equipment and for maintenance of physical property is to be supplied by the several counties (or city units as the case may be), by uniform county-wide tax to supplement fines, forfeitures, etc.

(7) Adequate provision for measurably equal facilities and opportunities for all communities—rural and urban alike.

The prohibition against the levy of any tax except as authorized in the general law has not been repealed and the other material provisions of the 1933 Act have been brought forward biennially in the several State School Machinery Acts since adopted.

So now we have a public school system which is "general" and "uniform" as required by the Constitution. No longer is the matter of school facilities left to the caprice of the several localities but every community, yea, every child, is to have substantially the same advantage and be subject to the same rules and regulations. *Lane v. Stanly,* 65 N. C., 153. See also *Board v. County Comrs.,* 174 N. C., 469, 93 S. E., 1001. Likewise, each county of the State is divided into a convenient number of districts, in which one or more public schools must be maintained at least six months (now eight) in every year, as provided by Art. IX, sec. 3, of the Constitution.

That the local act under consideration is in direct conflict with the general law as outlined seems to be clear. It undertakes to authorize the county authorities to create a district, which district is not created upon a uniform basis, nor is it created under the supervision of the State School Commission. It establishes a corporate or charter district in conflict with the avowed policy of the general law eliminating such districts. It authorizes a tax otherwise than as provided in the general law, which tax is not levied on a uniform, county-wide basis, and it is in other respects in conflict with the general law. This is in direct conflict with the general policy of the State in respect to the levy of school taxes, the creation of school districts and the administration of

the school law. *S. v. Dixon,* 215 N. C., 161, 1 S. E. (2d), 521, is directly in point. It is there said: "Sound policy demands that when the General Assembly has adopted a general and uniform plan or policy to be applied consistently throughout the State, local measures which tend to disrupt or destroy that plan, must yield to the more basic demands, State policy. The policy of the 'general law of the land' prevails over that of a contrary, local act." Therefore, the act is unconstitutional under the principles in the *Dixon case, supra.*

If we hold that the provisions of the local law are in conflict with the provisions of ch. 394, Public Laws 1937, which is the State School Machinery Act of that year and which contains the same material provisions incorporated in the 1933 act—and I think that we must—then the local act has been repealed and is nonexistent. The local act under consideration was ratified 13 March, 1937. Ch. 394, Public Laws 1937, was ratified 23 March, 1937, ten days thereafter, and contains in section 32 thereof the following provision: "All Public, Public-Local or Private Laws and clauses of laws in conflict with this act, to the extent of such conflict only, are hereby repealed." *Evans v. Mecklenburg County,* 205 N. C., 560, 172 S. E., 323; *Moore v. Board of Education,* 212 N. C., 499.

The Court, in the *Moore case, supra,* quotes with approval from the opinion in the *Evans case, supra,* as follows:

"These and other provisions of the Act of 1933 . . . including the clause which repeals all conflicting Public, Public-Local and Private Laws, indicate a legislative intent to annul or to subordinate to the new law all statutes relating to the public schools which were in effect at the time of its enactment and to establish a uniform system under which all the public schools of the State shall be conducted."

From whichever angle we view it this act is discriminatory.

Under the present law the duty to provide capital outlay funds is placed upon the several counties. It is a county obligation and must be met by a county-wide tax.

If we hold that this act is to enable the county to meet this obligation, then it constitutes a discrimination against the taxpayers of the district who are to pay the necessary tax to the exclusion of all other taxpayers within the county. Why should the taxpayers within a restricted district be required to pay the tax to meet a county-wide obligation? *Comrs. v. State Treasurer,* 174 N. C., 141, 93 S. E., 482.

If we treat the obligation created by the issuance and sale of the bonds as that of the district and not of the county, it is a discrimination against the taxpayers living outside the bounds of the district for the act permits—though it does not require—the payment of the bonds out of general county funds. The grant of the power to a county to pledge its credit or the authority to expend its funds is an incipient step in the

exercise of the power of taxation and, unless the obligation to be promoted be such as may be provided for by taxation, the power to make the pledge or to expend the fund does not exist and the Legislature cannot confer it. Being a district obligation it is not a necessary expense and the county may not use general funds for the payment thereof unless authorized by a favorable vote of the electors of the county, as a whole; *Comrs. v. State Treasurer, supra.* The act which seeks to authorize the county officials to do so is, in this respect, in conflict with Art. I, sec. 17, of the Constitution and is invalid.

The power to pay out of general funds having been conferred upon the county authorities we must assume that the power thus conferred will be exercised. It is no answer to this position to say that in the particular case before us no harm is likely to occur, for when a statute is being squared to the requirement of constitutional provision, it is what the law authorizes and not what is being presently done under it and not what is anticipated that furnishes the proper test of validity. *Comrs. v. State Treasurer, supra.* It is not within the legislative power to grant the right to tax one community for the exclusive benefit of another. *Comrs. v. State Treasurer, supra; Keith v. Lockhart,* 171 N. C., 451, 88 S. E., 460; *Faison v. Comrs.,* 171 N. C., 411, 88 S. E., 761. See also Cooley on Taxation (3d), 420; Judson on Taxation, sec. 254; 37 Cyc., 749.

For the reasons stated I am of the opinion that the act under consideration is unconstitutional and void for that: (1) It is local; (2) it is in direct conflict with the general policy and law of the State; and (3) it is discriminatory. Furthermore, it has been repealed.

DEVIN and WINBORNE, JJ., concur in this opinion.